20-01314-rdd  Case 1:20-cv-09187-UP  Doc 1  Filed 11/05/20  Document  Entered Filed 11/05/2009:06:02  Page Main 1 of 1 Document

Pg 1 of 100

KATSKY KORINS LLP
605 Third Avenue
New York, New York 10158
(212) 953-6000
Steven H. Newman, Esq.
Robert A. Abrams, Esq.

*Attorneys for Harlem Multifamily LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------x

HARLEM MULTIFAMILY LLC,

                                     Plaintiff,

          -against-

EIGHT-115 ASSOCIATES, LLC (SUCCESSOR BY
CONVERSION TO EIGHT-115 ASSOCIATES, L.P.), DANIEL
REIFER, NEW YORK CITY ENVIRONMENTAL CONTROL
BOARD, THE CITY OF NEW YORK, ACTING THROUGH
ITS DEPARTMENT OF HOUSING PRESERVATION AND
DEVELOPMENT and "JOHN DOE #1 through JOHN DOE
#100", the last hundred names being fictitious and unknown to
Plaintiff, the persons or parties intended being the tenants,
occupants, persons or corporations, if any, having or claiming an
interest upon the premises described in the Complaint,

                                     Defendants.

-----------------------------------------------------------------------------x

                        **20-cv-9187**

                        **NOTICE OF REMOVAL**

TO:   THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT,
         FOR THE SOUTHERN DISTRICT OF NEW YORK

      Plaintiff Harlem Multifamily LLC (the "**Plaintiff**"), by its attorneys, Katsky Korins

LLP, respectfully applies for the removal of a civil action now pending in the New York

Supreme Court, County of New York (the "**State Court Action**") to the United States District

Court for the Southern District of New York (the "**District Court**"), with the intention that the

State Court Action, upon removal, shall be promptly referred to the United States Bankruptcy

1

Court for the Southern District of New York (the "**Bankruptcy Court**") pursuant to a Standing Order of Reference dated January 31, 2012 (the "**Standing Order of Reference**") (Preska, C.J.), and in support thereof respectfully states as follows:

## BACKGROUND

1.      On August 6, 2020 (the "**Petition Date**"), Eight-115 Associates, LLC (successor by conversion to Eight-115 Associates, L.P.) (the "**Debtor**"), filed a voluntary petition for relief under Chapter 7 of Title 11 of the United States Code, as amended (the "**Bankruptcy Code**") in the Bankruptcy Court.  The Debtor's case has been assigned case number 20-11812 (MG) (the "**Bankruptcy Case**"), and is currently pending before the Honorable Martin Glenn, U.S.B.J.

2.      On August 7, 2020, Yann Geron (the "**Trustee**") was appointed interim trustee of the Debtor's estate. He thereafter qualified and is serving as permanent trustee.

3.      In this Notice of Removal, Plaintiff is exercising its right, pursuant to 28 U.S.C. §§ 1441 *et. seq.* and 1452, *et. seq.,* and Rule 9027 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), to remove the State Court Action entitled *Harlem Multifamily LLC v. Eight-115 Associates, LLC (Successor By Conversion to Eight-115 Associates, L.P.), et al.*, Index No. 850009/2020 from the Supreme Court of the State of New York, County of New York (the "**State Court**"), to the District Court, with the request that the State Court Action, upon removal, be promptly transferred to the Bankruptcy Court pursuant to the District Court's Standing Order of Reference.

## THE STATE COURT ACTION

4.      On or about January 22, 2020, Plaintiff commenced the State Court Action by filing in the State Court a summons and complaint (the "**Complaint**").

2

5.    On February 10, 2020, Plaintiff filed a motion in the State Court Action for the appointment of a receiver for the Debtor's real property (the "**Receiver Motion**").

6.    On March 3, 2020, the Debtor filed with the State Court a motion to dismiss the Complaint (the "**Motion to Dismiss**").  The Motion to Dismiss was brought by an Order to Show Cause dated March 4, 2020.

7.    On March 12, 2020, Plaintiff filed with the State Court an Amended Complaint (the "**Amended Complaint**"), a copy of which is annexed as <u>**Exhibit 1**</u>.

8.    On May 7, 2020, Daniel Reifer (the "**Guarantor**"), a guarantor of Plaintiff's loans to the Debtor, filed in the State Court an Answer to the Amended Complaint (the "**Guarantor Answer**"), a copy of which is annexed as <u>**Exhibit 2**</u>.

9.    Pursuant to an Order dated May 11, 2020, the State Court authorized the parties to supplement their respective briefing in connection with (i) the Motion to Dismiss and (ii) Plaintiff's Receiver Motion.  Thereafter, the parties filed supplemental briefs with the State Court. The Motion to Dismiss and the Receiver Motion were fully briefed and remained *sub judice* on the Petition Date.

10.    Plaintiff's Amended Complaint seeks, among other things, to foreclose on certain real property owned by the Debtor and to recover from the Guarantor any deficiency of the debt remaining unsatisfied after a sale of the Debtor's real property.

### THIS COURT HAS JURISDICTION TO ADJUDICATE<br>THE STATE COURT ACTION PURSUANT TO 28 U.S.C. § 1334 (b)

11.    The jurisdiction of the bankruptcy court is delineated in 28 U.S.C. § 1334(b), which states that "the district courts shall have original but not exclusive jurisdiction of all proceedings arising under title 11, or arising in or related to cases under title 11." <u>Celotex Corp. v. Edwards</u>, 514 U.S. 300, 307 (1995).

3

12.     Section 1334 provides the jurisdictional basis for removal of an action pursuant to 28 U.S.C. § 1452(a). District courts (and bankruptcy courts) may exercise three types of jurisdiction pursuant to the statute. They are "arising under" and "arising in" jurisdiction, which courts regard as a type of federal question jurisdiction, and "related to" jurisdiction. *See, e.g.* Sterling Vision, Inc. v. Sterling Optical Corp. (In re Sterling Optical Corp.), 302 B.R. 792, 801 (Bankr. S.D.N.Y. 2003). A bankruptcy judge may hear and determine any "core proceeding" that "arises under" or "arises in" an action under title 11 but may only hear a "non-core" proceeding if it is "related to" a bankruptcy action.  Union Turnpike, Inc. v. Howard Beach Fitness Center, Inc., 209 B.R. 307, 310-11 (S.D.N.Y. 1997). The Second Circuit has construed a bankruptcy court's core jurisdiction "as broadly as possible" so as to be "close to or congruent with constitutional limits."  Luan Investment S.E. v. Franklin 145 Corp. (In re Petrie Retail), 304 F.3d 223, 229 (2d Cir. 2002) (internal quotations and citations omitted).  This jurisdictional reach is "essential to the efficient administration of bankruptcy proceedings."  Id.

13.     The claims and causes of actions underlying the State Court Action are "core proceedings" within the meaning of *inter alia,* 28 U.S.C. §157(b)(2)(A),(B), (K), (M), (N) and (O) in that the State Court Action concerns, *inter alia,* (i) matters concerning the administration of the Debtor's estate, (ii) allowance or disallowance of claims against the estate, (iii) determinations of the validity, extent, or priority of liens, and (iv) matters affecting the liquation of the estate's assets.

14.     Further, Plaintiff and the Trustee have entered into a Stipulation in the Bankruptcy Case respecting, among other things, the sharing of proceeds between Plaintiff and the Debtor's estate from (i) the Trustee's recovery of avoidance claims against the Guarantor, and (ii) Plaintiff's recovery of any deficiency claim against the Guarantor following the sale of

4

the Debtor's real property (the "**Trustee/Plaintiff Stipulation**"). The Trustee/Plaintiff

Stipulation is in the process of being filed with the Bankruptcy Court and is incorporated herein

by reference hereby. Central to the prosecution of both the avoidance claims against the

Guarantor under §§ 547, 548, and 550 of the Bankruptcy Code and the deficiency claims

pursuant to RPAPL § 1371 is that the claims against the Guarantor  should be heard in one forum

-- the Bankruptcy Court. For these reasons, the Court has "arising in" "arising under" and

"related to" jurisdiction.

15.     As set forth *supra,* this Court has original jurisdiction over this State Court Action

pursuant to 28 U.S.C. § 1334(b).

16.     Accordingly, Plaintiff respectfully submits that the State Court Action should be

removed to this Court pursuant to 28 U.S.C. § 1452 and Bankruptcy Rule 9027.

17.     Twenty-Eight U.S.C. § 1452(a) provides as follows:

**Removal of claims related to bankruptcy cases**

 (a) A party may remove any claim or cause of action in a civil
action other than a proceeding before the United States Tax Court
or a civil action by a governmental unit's police or regulatory
power, to the district court where such civil action is pending, if
such district court has jurisdiction of such claim or cause of action
under section 1334 of this title.

18.     The State Court Action, including all claims and causes of action asserted therein,

is a civil action other than a proceeding before the United States Tax Court; and is not a civil

action by a governmental unit to enforce such governmental unit's police or regulatory power. In

addition, the Southern District of New York encompasses New York County, which is where the

State Court Action is pending.

19.     As stated in California Public Employees' Retirement System v. Worldcom, Inc.,

368 F.3d 86 (2d. Cir. 2004), "When Congress enacted Section 1452(a) in 1984,. . . 'Congress

5

intended to grant comprehensive jurisdiction to bankruptcy courts so that they might deal
efficiently and expeditiously with *all* matters connected with the bankruptcy estate' . . .
Accordingly, in its every detail, Section 1452(a) is designed to further Congress's purpose of
centralizing bankruptcy litigation in a federal forum." California Public Employees' Retirement
System, 268 F.3d at 103 (emphasis is original, quoting Celotex v. Edwards, 514 U.S. 300, 308 n.
5 (1995)).  That premise is applicable in the instant case where the subject matter concerns a
determination of the Debtor's indebtedness to Plaintiff and the prosecution of avoidance and
deficiency claims against the Guarantor.

20.     Here, although Plaintiff's claims are nominally state law claims, the nature of the
proceedings and the relief requested nevertheless provide this Court with each of "arising in",
"arising under", and "related to" jurisdiction over this action, pursuant to 28 U.S.C. § 1334(b).
This action "arises in" and "arising under" a case under Title 11 because it concerns, *inter alia,*
the administration of assets of the Debtor's estate and an adjudication of claims asserted against
the Debtor -- which constitutes a "core proceeding" under 28 U.S.C. § 157(b). In addition, the
State Court Action is also "related to" a case under Title 11 because it involves property of the
Debtor's estate and will have a direct and conceivable impact on the amount of the funds
available to creditors of the Debtor and on the handling and administration of the bankrupt estate.
Indeed, the resolution claims asserted by the Plaintiff in the State Court Action will directly
affect the amount of any distribution to the Debtor's creditors. In addition, the removal of this
State Court Action will assist in administering the Debtor's estate by potentially avoiding
concurrent proceedings addressing the same subject matter, as shown below.

21.     To the extent that the Bankruptcy Court does not possess core jurisdiction over
Plaintiff's claims, it possesses "related-to" jurisdiction over them.  A proceeding meets the

jurisdictional threshold of 28 U.S.C. § 1334(b) if the outcome of that proceeding could

conceivably have any effect on the estate being administered in bankruptcy. Although 28 U.S.C.

§ 1334(b) does not provide a definition for "related to" actions, the Second Circuit applies the

following test to determine if a third party action is related to a bankruptcy proceeding:

> The test for determining whether litigation has a significant
> connection with a pending bankruptcy proceeding is whether its
> outcome might have any *"conceivable effect"* on the bankruptcy
> estate. If that question is answered affirmatively, the litigation falls
> within the "related to" jurisdiction of the bankruptcy court.
> (Emphasis supplied.)

Publicker Industries Inc. v. United States (In re Cuyahoga), 980 F.2d 110, 114 (2d Cir. 1992);

See e.g., In re Cayahoga Equipment Corp., 980 F.2d 110, 114 (2d Cir. 1992) (stating the

bankruptcy court has "related to" jurisdiction over any action that might have a "conceivable

effect" on the bankrupt estate).

22.     Claims to foreclose on real property and to fix the amount of the Debtor's

indebtedness have been properly removed from a state court to a bankruptcy court. For example,

In re 47-49 Charles St., 98 CIV. 4669 (HB), 1999 WL 138929 (S.D.N.Y. Mar. 15, 1999) is four-

square on point. There, the issue before the District Court was whether a state court foreclosure

action removed to the district court should proceed in bankruptcy court or be remanded to state

court. In directing that the foreclosure proceeding be referred to the Bankruptcy Court, District

Judge Baer held:

> For disposition purposes, I need go no further in my analysis than
> to conclude that the foreclosure action involves property which is
> the sole asset of the Debtor. Thus, the outcome of the matter, if it
> were remanded to the state level, will likely effect the
> administration of the estate in bankruptcy court. *See id.* Further,
> the bankruptcy court has jurisdiction over the foreclosure action
> since it is, at the very least, a related proceeding as described in §
> 1334(b) of title 28.

7

*Id*. at *2. *See also*, Le Sannom Bldg. Corp. v. Nathanson, 92 CIV. 8716 (LAP), 1993 WL 330442, at *2 (S.D.N.Y. Aug. 23, 1993) (state court foreclosure proceeding was removed to the bankruptcy court as an adversary proceeding within the chapter 11 case); Kerusa, Co. LLC v.W1OZ/515 Real Estate Ltd. Partnership, No. 04 Civ. 708 (GEL), 2004 WL1048239 at *3 (S.D.N.Y. May 7, 2004) (claims against non-debtor were clearly "related to" bankruptcy case because they likely give rise to contribution or indemnity claims). Here, the resolution of Plaintiff's claims and the prosecution of any claims against the Guarantor will directly affect the amount of monies available for distribution to the Debtor's creditors. Therefore, Plaintiff's claims are "related to" the Bankruptcy Case as they will have a "conceivable effect" on the Debtor's estate. Indeed, given that the Debtor's estate has few other assets, the Plaintiff's claims will have a material impact on the amount of any distribution to creditors.

23.     Finally, Bankruptcy Rule 9027 sets forth certain procedures for the removal of a civil action to the Bankruptcy Court. It provides, in pertinent part, as follows:

> **Removal**
>
> *(a) Notice of Removal . . .*
>
> *(2) Time for Filing; Civil Action Initiated Before Commencement of the Case Under the Code.* If the claim or cause of action in a civil action is pending when a case under the Code is commenced, a notice of removal may be filed only within the longest of (A) 90 days after the order for relief in the case under the Code, (B) 30 days after entry of an order terminating a stay, if the claim or cause of action in a civil action has been stayed under §362 of the Code, or (C) 30 days after a trustee qualifies in a Chapter 11 reorganization case but not later than 180 days after the order for relief.

24.     At the time of the commencement of the Bankruptcy Case, the State Court Action was pending in the State Court and, until the filing of this Notice of Removal and the filing of a copy of this Notice of Removal with the State Court, continues to be pending in the State Court.

8

Furthermore, this Notice of Removal is timely pursuant to Bankruptcy Rule 9027(a)(2) as it has

been filed within 90 days of the filing of the Debtor's Bankruptcy Case.[1]

25.     Pursuant to 28 U.S.C. § 157 and the Standing Order of Reference, the Bankruptcy

Court presiding over the Bankruptcy Case has jurisdiction over the causes of action asserted in

the State Court Action under 28 U.S.C. § 1334.  Although, as a procedural matter, removal is to

the District Court, upon removal to the District Court, pursuant to 28 U.S.C. § 157(a) and the

Standing Order of Reference, it should be ***automatically*** referred to the Bankruptcy Court.

Plaintiff respectfully submits that the State Court Action should be thereafter referred to

Bankruptcy Judge Martin Glenn, as His Honor is fully familiar with the facts and circumstances

of the Debtor's Bankruptcy Case.

26.     In light of the foregoing, the Bankruptcy Court can and should adjudicate

Plaintiff's Complaint in the State Court Action.

### No Prior Application

27.     No previous application has been made for this or any similar relief in this or any

other Court.

28.     In accordance with 28 U.S.C. § 1452 and Bankruptcy Rule 9027(c), after the

filing of this Notice of Removal, Plaintiff shall promptly give written notice of the filing of this

Notice of Removal to the parties to the State Court Action, including to counsel for the Chapter 7

Trustee (a copy of which proposed notice without exhibits is annexed hereto as **Exhibit 3**), and

shall file a copy of such notice with the County Clerk of the Supreme Court of the State of New

York, County of New York.

---

[1] Bankruptcy Rule 9027(a)(1) provides that Plaintiff attach to the Notice of Removal "a copy of all process and pleadings."  Attached hereto is the Amended Complaint and the Guarantor's Answer. As noted, the Debtor has not yet answered the Amended Complaint; it filed the Motion to Dismiss.

WHEREFORE, Plaintiff respectfully requests that the matter of *Harlem Multifamily*

*LLC v. Eight-115 Associates, LLC (Successor By Conversion to Eight-115 Associates, L.P.), et*

*al.*, Index No. 850009/2020, presently pending in the State Court, be removed to the District

Court, that this Court accept jurisdiction of said action and, upon acceptance of jurisdiction, that

this matter thereupon be referred to the Bankruptcy Court pursuant to the District Court's

Standing Order of Reference.

Dated: November 3, 2020
      New York, New York

                                  Respectfully submitted,

                                  KATSKY KORINS LLP

                                  By:/s/ Robert A. Abrams
                                      Steven H. Newman, Esq.
                                      Robert A. Abrams, Esq.
                                  605 Third Avenue
                                  New York, New York 10158
                                  (212) 953-6000
                                  snewman@katskykorins.com
                                  rabrams@katskykorins.com

                                  *Attorneys for Harlem Multifamily LLC*

10

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
-------------------------------------------------------------------------x

HARLEM MULTIFAMILY LLC,

                                  Plaintiff,

            -against-

EIGHT-115 ASSOCIATES, LLC (SUCCESSOR BY
CONVERSION TO EIGHT-115 ASSOCIATES, L.P.), DANIEL
REIFER, NEW YORK CITY ENVIRONMENTAL CONTROL
BOARD, THE CITY OF NEW YORK, ACTING THROUGH
ITS DEPARTMENT OF HOUSING PRESERVATION AND
DEVELOPMENT and "JOHN DOE #1 through JOHN DOE
#100", the last hundred names being fictitious and unknown to
Plaintiff, the persons or parties intended being the tenants,
occupants, persons or corporations, if any, having or claiming an
interest upon the premises described in the Complaint,

                                 Defendants.
-------------------------------------------------------------------------x

**Index No.: 850009/2020**

**Date Filed: 1/22/2020**

**AMENDED VERIFIED
COMPLAINT IN A
FORECLOSURE ACTION**

      Harlem Multifamily LLC (the "**Plaintiff**"), by and through its attorneys, Katsky Korins

LLP, as and for its amended verified complaint against the defendants, respectfully alleges as

follows:

## NATURE OF THE ACTION

      1.     This is an action brought pursuant to New York Real Property Actions and

Proceedings Law Sections 1301 <u>et</u> <u>seq</u>. to foreclose certain commercial real estate mortgages

encumbering, among other things, six (6) parcels of real property, as more particularly described

below.

      2.     The two underlying Loans (as defined below) were borrowed by Eight-115

Associates, LLC (as successor by conversion to Eight-115 Associates, L.P.), a Delaware limited

liability company (the "**Borrower**").

554625-1

3.      Each of the Loans matured by their terms on December 10, 2019. Despite maturity of the Loans, the Borrower and the Guarantor (as defined below) failed to pay their obligations under the Loans.

4.      In addition to the maturity of the Loans and the failure to pay such Loans in full, other events of default under the Loan Documents (as defined below) occurred and continue to exist.

5.      Each of the Loans is cross-defaulted with the other Loan.

6.      As set forth below, upon information and belief, Daniel Ross Reifer (the **"Guarantor"**), Stanley Reifer (**"Stanley"**), and the Borrower engaged in pattern and practice of unauthorized payments of the Borrower's property to the Guarantor, Stanley and entities under their respective control, which bore no business relationship to the Borrower or the Property (as defined below), and was done solely to enrich the Guarantor and/or Stanley at the expense of and to the detriment of the Borrower, and the Borrower's creditors, including the Plaintiff.

7.      In addition, the Borrower and the Guarantor have allowed dozens of violations to continue to exist at the Property which resulted in, among other things, waste of the Property and other Borrower assets and an event of default under the Loan Documents.

8.      The Borrower's failure to pay the Loans in full at maturity and the existence of other events of default have necessitated this action.

## THE PARTIES

9.      The Plaintiff is the owner and holder of each of the Notes (as defined below) and Mortgages (as defined below).

10.      The Plaintiff has an office for the transaction of business located at 100 Park Avenue, Suite 2805, New York, New York 10017 and is authorized to conduct business in the State of New York.

2

11.     The Borrower is a Delaware limited liability company and has an office located at c/o Reifer Management, 307 West 117th Street, New York, New York 10026.

12.     The sole member and sole manager of the Borrower is Lincoln 95 Associates, L.P. ("**Lincoln 95**").

13.     The Guarantor's father, Stanley, is the sole general partner of Lincoln 95.

14.     The Guarantor is an individual and has a primary residence located at 924 West End Avenue, Apt. 115, New York, New York 10025 and a primary place of business located at c/o RMC Equities, LLC, 26 Court Street, Suite 2304, Brooklyn, New York 11242.

15.     Upon information and belief, (i) DRR Irrevocable Trust (the "**DRR Trust**") is a New York trust of which Guarantor is a co-trustee and the sole beneficiary, and (ii) DRR Trust is a limited partner of Lincoln 95 and owns an approximate 89% limited partnership interest in Lincoln 95.

16.     Upon information and belief, (i) the Guarantor owns an approximate 5% limited partnership interest in Lincoln 95, (ii) the Guarantor's brother, Jeremy Reifer ("**Jeremy**"), owns an approximate 4% limited partnership interest in Lincoln 95, and (iii) other than Stanley, the DRR Trust, the Guarantor, and Jeremy, there are no other general or limited partners in Lincoln 95.

17.     Upon information and belief, in its capacity as sole member and manager of the Borrower, Lincoln 95 manages all of the Borrower's business, assets and affairs.

18.     The Guarantor is a named party defendant to this action by virtue of the fact that he personally guaranteed the Guaranteed Obligations (as defined in the "Guaranties", as defined below) due under the Loan Documents.

19.     New York City Environmental Control Board (the "**ECB**") is named a party defendant to this action in order to extinguish any right, title, or interest it may have in the

3

Property, or any part thereof, including without limitation, by reason of any open ECB violations, liens or judgments, all of which interests are subject to and subordinate to the liens of the Mortgages.

20.    The City of New York acting through its Department of Housing Preservation And Development ("**HPD**") is named a party defendant to this action in order to extinguish any right, title, or interest it may have in the Property, or any part thereof, including without limitation, by reason of the CPC Mortgage (as defined below) (i) which CPC Mortgage was paid off in full and satisfied on or about May 3, 2011, prior to the origination of either the Loans, and (ii) which CPC Mortgage is no longer a valid lien or mortgage against the Property and alternatively, in all events HPD's interests in the Property are subject to and subordinate to the liens of the Mortgages.

21.    Upon information and belief, the "John Doe" defendants constitute persons and entities who may be in possession of, or may have possessory liens or other interests in the Property, which possessory liens or other interests, if any, are subordinate to and subject to the mortgages being foreclosed herein.  Said defendants are named as party-defendants hereto for the purpose of terminating their interests.

## AS AND FOR A FIRST CAUSE OF ACTION

### The First Loan

22.    On or about the following date, the Borrower, for the purpose of evidencing a loan in the following principal amount, duly executed, acknowledged and delivered to Signature Bank, a New York banking corporation (the "**Bank**"), as obligee, the following instrument, a true and correct copy of which is annexed hereto as **Exhibit "A"**, with the same force and effect as if set forth at length herein:

4

554625-1

| INSTRUMENT: | Amended, Consolidated and Restated Mortgage Note (the "**First Note**") |
| --- | --- |
| DATE: | November 25, 2014 |
| OBLIGOR: | The Borrower |
| OBLIGEE: | The Bank |
| PRINCIPAL AMOUNT: | $5,775,000.00 (the loan evidenced by the First Note being referred to herein as the "**First Loan**") |

23.    The Bank advanced the entire $5,775,000.00 principal amount of the First Loan.

24.    For the purpose of securing payment of the indebtedness due in connection with the First Loan and the First Note, the Borrower, as mortgagor, on or about said date executed, acknowledged and delivered to the Bank, as mortgagee, a certain Mortgage Consolidation, Modification, Security Agreement and Fixture Filing dated November 25, 2014 (the "**First Mortgage**").  A true and correct copy of the First Mortgage is annexed hereto as **Exhibit "B"**, with the same force and effect as if set forth at length herein.  Pursuant to the First Mortgage, the Borrower, as mortgagor, mortgaged to the Bank, as mortgagee, certain real property commonly known as **264 West 115th Street, New York, New York 10026 (Section: 7, Block: 1830, Lot: 53) ("Parcel I"), 276 West 115th Street, New York, New York 10026 (Section: 7, Block: 1830, Lot: 59) ("Parcel II"), 278 West 115th Street, New York, New York 10026 (Section: 7, Block: 1830, Lot: 60) ("Parcel III"), 2124 Fredrick Douglass Boulevard a/k/a 2124 8th Avenue, New York, New York 10026 (Section: 7, Block: 1830, Lot: 63) ("Parcel IV"), 2120 Fredrick Douglass Boulevard a/k/a 2120B Fredrick Douglass Boulevard a/k/a 2120 8th Avenue a/k/a 2120B 8th Avenue, New York, New York 10026 (Section: 7, Block: 1830, Lot: 64) ("Parcel V"), and 2122 Fredrick Douglass Boulevard a/k/a 2122 8th Avenue, New York, New York 10026 (Section: 7, Block: 1830, Lot: 163) ("Parcel VI")** (Parcel I through Parcel

5

VI, together with all other property and any buildings, improvements, leases, rents, fixtures, machinery, equipment, personalty and other rights and interests of any kind or nature which are the subject of the mortgages described in this amended foreclosure complaint, are hereinafter collectively referred to as the "**Property**"). A schedule setting forth the mortgages which were consolidated into the First Mortgage and the pertinent recording information is set forth in Schedule B annexed hereto as **Exhibit "C"**.

25. The First Mortgage was duly recorded as follows in the office for the recording of mortgages in the county in which said mortgaged Property was then and is now situated, and the recording data is as follows:

| | |
|---|---|
| RECORDED IN: | The Office of City Register of the City of New York, County of New York (the "**Register's Office**") |
| DATE OF RECORDING: | January 12, 2015 |
| CRFN: | 2015000013563 |

26. Any applicable recording tax was duly paid at the time of recording of the First Mortgage.

27. In order to induce the Bank to make the First Loan to the Borrower, the Guarantor, i.e., Daniel Ross Reifer, an individual, duly executed, acknowledged and delivered to the Bank a certain Limited Guaranty dated November 25, 2014 (the "**First Loan Guaranty**"). A true and correct copy of the First Loan Guaranty is annexed as **Exhibit "D"** hereto.

28. Guarantor is the owner of a direct or indirect interest in the Borrower.

29. Guarantor received a direct benefit from the Bank making the First Loan to the Borrower.

30. Pursuant to the First Loan Guaranty, the Guarantor irrevocably and unconditionally guaranteed to the Bank, and its successors and assigns (including, without

6

limitation, the Plaintiff), the payment and performance of any and all Guaranteed Obligations (as that term is defined in the First Loan Guaranty) as and when the same shall be due and payable.

31.     The First Note, First Mortgage, and First Loan Guaranty, together with all other documents and/or agreements that were executed and/or delivered in connection with the First Loan, are collectively referred to herein as the "**First Loan Documents**".

32.     Pursuant to, among other things (i) an Allonge, dated as of December 11, 2019 (the "**First Note Allonge**"), (ii) an Assignment of Mortgage Without Covenant, dated as of December 11, 2019 (the "**First Mortgage Assignment**"), and (iii) an Omnibus Assignment dated as of December 11, 2019 (the "**Omnibus Assignment of Loan Documents**"), the First Note, the First Mortgage, the First Loan Guaranty, and all of the other First Loan Documents were duly assigned by the Bank to Plaintiff.  A true and correct copy of the First Note Allonge is attached to the First Note annexed hereto as **Exhibit "A"**.  A true and correct copy of the First Mortgage Assignment is annexed hereto as **Exhibit "E"**.  The First Mortgage Assignment was sent to be recorded with the Register's Office.  A true and correct copy of the Omnibus Assignment of Loan Documents is annexed hereto as **Exhibit "F"**.

33.     As a result of the above-described assignments, Plaintiff has possession of the First Loan Documents, is now the owner and holder of the First Loan Documents, and of any and all other documents evidencing, securing or guarantying the First Loan as such may have thereafter been modified or amended, and Plaintiff is entitled to enforce its rights under all of the First Loan Documents.

34.     The Borrower and the Guarantor have breached their obligations under the First Loan Documents.

35.     Multiple Events of Default under the First Loan Documents have occurred and continue to exist, including, without limitation, those described below.

7

36.     Section 2.1.1. of the First Mortgage entitled "Events of Default-Optional Acceleration" provides in pertinent part:

> "The Debt shall become due, at the option of the Mortgagee, upon the occurrence of any of the following events, which event shall be an 'Event of Default':
>
> (a)  after default in the payment of any installment of principal or interest as provided in the [First] Note;
>
> (b)  after default in the payment when due and payable of any other sum of money required to be paid or expended under this [First] Mortgage, the [First] Note, or any other [First] Loan Document (as hereinafter defined); ...
>
> (j)  the failure of the Mortgagor to perform or observe any term, covenant, condition or obligation of any bond, note, loan agreement, guarantee, or any other instrument or agreement in connection with the borrowing of money or the obtaining of advances or credit, or of any instrument given to secure the same, to which such party and Mortgagee or its affiliates are parties;
>
> (k)  if a default beyond any applicable notice and grace period occurs under any mortgage which is prior, equal or subordinate to the lien of this [First] Mortgage or the mortgagee under any such prior, equal or subordinate mortgages commences a foreclosure action in connection with said mortgage;"

37.     Section 2.1.2 of the First Mortgage entitled "Events of Default-Automatic Acceleration" provides in pertinent part:

> "The Debt shall forthwith and automatically become due, upon the occurrence of any of the following events which event shall also be an 'Event of Default':
>
> if the [Borrower] or the Guarantor shall: ...
>
> (viii)  conceal, remove or permit to be concealed or removed, any part of its property, with intent to hinder, delay or defraud its creditors or any of them,

8

554625-1

(ix)    make or suffer a transfer of any of its property which may be fraudulent under any bankruptcy, fraudulent conveyance or similar law,"

38.    Section 2.2. of the First Mortgage entitled "Remedies" provides in pertinent part:

"(a) Upon the occurrence of any Event of Default, the Mortgagee may, in addition to any rights or remedies available to it hereunder or at law, take such action as it deems advisable to protect enforce its rights against the Mortgagor and in and to the Mortgaged Property, including the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as the Mortgagee may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of the Mortgagee:

(i)    declare the entire unpaid Debt to be immediately due and payable;"

39.    The Borrower breached and defaulted on its obligations under the First Loan Documents by, among other things, and without limitation: (i) failing and omitting to pay the First Loan in full on or before the December 10, 2019 maturity date of the First Note (the "**First Loan Maturity Default**"); (ii) upon information and belief, failing and omitting to correct, and/or make a good faith effort to remove, the violations against the Property pursuant to the Second Loan Violations Affidavit (defined below), constituting a cross-default pursuant to, among other things, Sections 2.1.1(j) and 2.1.1(k) of the First Mortgage (the "**Violations Cross-Default**"); (iii) failing and omitting to pay the Second Loan (defined below) in full on or before the December 10, 2019 maturity date of the Second Note (defined below), constituting a cross-default pursuant to, among other things, Sections 2.1.1(j) and 2.1.1(k) of the First Mortgage (the "**Second Loan Maturity Cross-Default**"); and (iv) committing acts or allowing the occurrence of acts which caused the Second Loan Section 2.1.2 Defaults (as defined below), consisting of

9

and constituting constituting cross defaults pursuant, among other things, Sections 2.1.1(j) and 2.1(k) of the First Mortgage (the "**Second Loan Section 2.1.2 Cross-Defaults**").

40.     In addition, other automatic Events of Default occurred under Section 2.1.2 (vii) and (ix) of the First Mortgage as a result of the Borrower's and the Guarantor's acts to (a) conceal, remove or permit to be concealed or removed, part of the Borrower's property, with intent to hinder, delay or defraud the Borrower's creditors, and (b) make, or cause the Borrower to suffer, one or more transfers of part of the Borrower's property which may be fraudulent under any bankruptcy, fraudulent conveyance or similar law, including, but not limited to, those acts set forth below (such Events of Default being the "**Section 2.1.2 Defaults**").

41.     The First Loan Maturity Date Default, the Violations Cross-Default, the Second Loan Maturity Cross-Default, the Second Loan Section 2.1.2 Cross-Defaults, and the Section 2.1.2 Defaults are collectively referred to herein as the "**First Loan Events of Default**". All of the First Loan Events of Default constitute Events of Default as defined in the First Loan Documents.

## Wrongful Acts By Borrower, Guarantor and Stanley

42.     Upon information and belief, Lincoln 95 owns, manages and operates all of its assets, including its real property holdings, cash and receivables, through the Borrower, which Lincoln 95 completely controls as its sole member and sole manager pursuant to an operating agreement of the Borrower.

43.     In its capacity as sole member and sole manager of the Borrower, Lincoln 95 manages all of the Borrower's business and affairs.

44.     Upon information and belief, RMC Equities, LLC ("**RMC Equities**") is a New York limited liability company entity that the Guarantor directly or indirectly owns and controls.

10

45.     Upon information and belief, from April 2013 until October 2017, RMC Equities acted as the managing agent for the Property.

46.     On or about November 4, 2019 Stanley, on behalf of himself, the Borrower and Lincoln 95 commenced an action in the Supreme Court of New York County against the Guarantor, the DRR Trust and RMC Equities, which action was assigned Index No. 656509/2019 ("**Stanley's Misconduct Action**").   A copy of the complaint, without exhibits thereto, in the Stanley's Misconduct Action is annexed hereto as **Exhibit "Q"**.

47.     In the Stanley's Misconduct Action, the plaintiffs claim that the Guarantor, among other things, engaged in clandestine acts to misappropriate over $1,000,000.00 from the Borrower and engaged in a pattern and practice of unauthorized payments to himself and entities the Guarantor controlled, which have no business relationship to the Borrower and which were solely to enrich the Guarantor to the detriment of the Borrower.

48.     Upon information and belief, during the period in which RMC Equites was the managing agent for the Property, the Guarantor, acting through RMC Equities, collected rents, paid business expenses, and had signatory authority on the Borrower's bank accounts.

49.     Upon information and belief, during the period in which RMC Equites was the managing agent for the Property, the Borrower had at least two bank accounts with Signature Bank, one ending in -2500 and the other ending in -4209 (the "**Bank Accounts**").

50.     Upon information and belief, during the period in which RMC Equities was the managing agent for the Property, all rental income from the Property was deposited in the Bank Accounts.

51.     All of the money in the Bank Accounts was the property of the Borrower.

52.     Upon information and belief, utilizing his signatory authority over the Borrower's Bank Accounts, the Guarantor effectuated withdrawals from the Bank Accounts that were not for

11

the benefit of the Borrower, and instead were to pay for personal or expenses of the Guarantor's other business.

53. Upon information and belief, for example, the Guarantor made a number of unauthorized payments or transfers from the Bank Accounts to the DRR Trust and himself.

54. Upon information and belief, on or about January 6, 2015, the Guarantor made an unauthorized payment to himself of $100,000.00 by writing a check to "D. Reifer" for $100,000.00, with the memo line stating, "distribution".

55. Upon information and belief, the proceeds of the Second Loan were deposited into the Borrower's Bank Account ending in -2500, over which RMC Equities and the Guarantor had signatory authority.

56. Upon information and belief, soon after the closing of the Second Loan the Guarantor transferred no less than $750,000.00 from the Bank Accounts to unidentified account(s) under the Guarantor's custody or control.

57. Upon information and belief, for example, on or about November 4, 2016, the Guarantor wrote a check from the Borrower's account made payable to "DRR Irrevocable Trust" for $175,000.00, with the memo line stating, "distribution".

58. Upon information and belief, further, on November 7, 2016, the Guarantor wrote a check from the Borrower's account made payable to "DRR Irrevocable Trust" for $225,000.00, without the memo line stating, "distribution".

59. Upon information and belief, on November 16, 2016, the Guarantor wrote a check from the Borrower's account made payable to DRR Irrevocable Trust" for $300,000.00, with the memo line stating, "dist," which is short for "distribution".

12

60.     Upon information and belief, on December 7, 2016 the Guarantor wrote a check from the Borrower's account made payable to "DRR Irrevocable Trust" for $50,000.00, with the memo line stating, "dist," which is short for "distribution".

61.     Upon information and belief, more unauthorized distributions and uses of business funds for personal expenses will be uncovered through discovery.

62.     Upon information and belief, the payments and transfers of the Borrower's money that the Guarantor and RMC Equities made to the Guarantor and the DRR Trust were part of a fraudulent scheme by the Guarantor to wrongfully and intentionally bleed funds from the Borrower to the detriment of the Borrower and its creditors.

63.     Upon information and belief, during the time that the Guarantor and RMC Equities managed the Property, (i) RMC Equities failed to properly maintain the rent rolls and fund the security deposit account, (ii) key personnel and other creditors' bills went unpaid, (iii) the Borrower failed to pay when due certain monthly debt service payments on account of the Loans, and (iv) the Borrower and the Guarantor failed to remove and remedy the violations identified in the Second Loan Violations Affidavit, almost all of which violations continue to exist.

64.     Upon information and belief, on or about October 20, 2017, Stanley and/or Lincoln 95 terminated RMC Equities as the managing agent for the Property.

65.     Upon information and belief, the Guarantor's and RMC Equities' conduct, as described above, was intentional, willful, knowing, malicious, wanton, reckless, and done in bad faith and under such circumstances as to demonstrate conscious indifference to and utter disregard for its effect upon the rights and/or financial interests of the Borrower and its creditors.

66.     Upon information and belief, the Guarantor actively or constructively misappropriated and transferred property of the Borrower to the Guarantor, RMC Equities or

13

DRR Irrevocable Trust for the Guarantor's own personal use and benefit without fair consideration provided to the Borrower.

67.     Specifically, upon information and belief, the Guarantor, directly or indirectly through RMC Equities, and/or DRR Irrevocable Trust, intentionally withdrew $1,047,000.00 of the Borrower's funds and transferred them to the accounts that the Guarantor owns or controls and are not affiliated with the Borrower, in order to use them for the Guarantor's own benefit and/or for purposes other than the business of the Borrower.

68.     Upon information and belief, the Guarantor wrongfully transferred the Borrower's funds to maintain a lavish lifestyle and the Guarantor improperly utilized these funds to pay for his personal and or other business liabilities and expenses unrelated to the Borrower.

69.     Upon information and belief, in furtherance of his wrongful and fraudulent scheme to misappropriate and transfer the Borrower's funds to himself, directly or indirectly, the Guarantor attempted to mischaracterize these payments as "distributions."

70.     Upon information and belief, the Guarantor did not disclose these payments to Lincoln 95 or the Borrower or Borrower's creditors and instead attempted to conceal from them, the funds misappropriated by the Guarantor.

71.     Upon information and belief, the Guarantor's conduct, as alleged herein, was undertaken in bad faith and as part of an intentionally and morally blameworthy scheme to wrongfully enrich himself at the expense of, and detriment of, the Borrower and its creditors.

72.     Upon information and belief, the Borrower committed other improper transfers and misconduct with respect to the Borrower's property through the actions of Stanley.

73.     Indeed, the Guarantor commenced an action in the Supreme Court of New York County against Stanley, which action was assigned Index No. 654909/2017 (the "**Guarantor's Misconduct Action**").

14

74. In the Guarantor's Misconduct Action, the Guarantor swore in an affidavit dated February 12, 2020 (the **"Guarantor's Affidavit"**)[1] and filed in the Guarantor's Misconduct Action (NYSCEF No. 156) that the Stanley engaged in misconduct and specifically asserted, among other things, the following:

(a) On July 5, 2017, Stanley, without the authorization, knowledge, or consent of the limited partners of Lincoln 95, withdrew $100,000.00 from the Borrower's bank account, which left the Borrower's account with an overdraft of $74,129.63.

(b) Stanley then deposited the $100,000.00 into a bank account held by his management company, Reifer Management Corp. (**"Reifer Management"**).

(c) Later that same day, Stanley withdrew $80,000.00 from Reifer Management's account and deposited it into a bank account held by Eight-17 Associates L.P. (**"Eight-17"**), another entity managed and controlled by Stanley. Eight-17 is not affiliated with Lincoln 95, the Borrower, or the Property.

(d) Stanley subsequently transferred a portion of this $80,000.00 from Eight-17's bank account to other entities that he owns and controls, including Central 11 Apartments and Garrett Associates.

(e) As a result of Stanley's withdrawal of funds from the Borrower's account and the sizeable overdraft that was left on the account, the Borrower was on the verge of defaulting on its Loans.

(f) In July 2017, the Borrower failed to timely pay its monthly debt service payment owed on the Loans and the Bank notified Guarantor of such payment default.

---

[1] A copy of the Guarantor's Affidavit, without exhibits thereto, is annexed hereto as **Exhibit "R"**.

(g)     To date, Stanley has failed to the $100,000.00 that he took from the Borrower.

(h)     On or about October 20, 2017, Stanley terminated RMC Equities as managing agent for the Property and appointed himself and/or Reifer Management in its place.

(i)     After Reifer Management took over as managing agent of the Property, Stanley began abusing his position to further transfer funds from the Borrower's accounts to himself and used the Borrower's funds to pay Stanley's personal expenses and the expenses of Stanley's other entities, as well as to make unauthorized payments.

(j)     In addition, from approximately October 2017 through the present, Stanley has repeatedly caused the Borrower to borrow money from himself and other entities that he owns and/or controls.

(k)     None of such additional loans were made with the consent of a majority of the limited partners, as required by paragraph 6.3(B)(d) of the Lincoln 95's partnership agreement.

(l)     On or about December 18, 2018, Stanley also caused the Borrower to make an unauthorized loan of $5,000.00 to Eight-17, which loan does not appear to have been repaid.

(m)     Moreover, from approximately November 2017 through the present, Stanley has caused the Borrower to pay himself a management fee of 8% of the total rent roll for the Property, in violation of Article IX of Lincoln 95's partnership agreement, which limits such fees to no more than 6% of the total rent roll.

(n)     This has caused the Borrower to pay Stanley tens of thousands of dollars in excess of what was allowed, to Stanley's benefit.

16

(o)     Despite the pendency of the Guarantor's Misconduct Action concerning Stanley's abuse of his control over Lincoln 95 and the Borrower, Stanley's abuse appears to have continued unabated.

75.     All of Stanley's wrongfully acts constitute actions by the Borrower, since Stanley was, and still is, the sole general partner of Lincoln 95, which is the sole manager of the Debtor and therefore Stanley acted as the direct or indirect manager and/or agent of the Borrower at all relevant times.

76.     The dollar amount of the Guarantor's and the Borrower's fraudulent transfers will be determined at trial, but is believed to be not less than $1,147,000.00, plus interest thereon.

77.     Upon information and belief, the transfers caused by the Guarantor and Stanley (and in turn by the Borrower) left the Borrower with an insufficient capital to pay its debts as they came due.

78.     Upon information and belief, the transfers caused by the Guarantor and Stanley (and in turn by the Borrower) rendered the Borrower insolvent and unable to pay its debts as they came due.

79.     Upon information and belief, the Guarantor's and Stanley's (and in turn by the Borrower) conduct, as described above, was intentional, willful, knowing, malicious, wanton, reckless, and done in bad faith and under such circumstances as to demonstrate conscious indifference to and utter disregard for its effects upon the rights and/or financial interests of the Borrower and its creditors, and the wrongful transfers of the Borrower's property was done to intentionally hinder, delay or defraud its creditors.

80.     Upon information and belief, the transfers by the Guarantor and/or the Borrower of the Borrower's property described above, and such other transfers as may be ascertained in

17

discovery, are avoidable under, among other things, Sections 273, 274, 275 and/or 276 of the New York Debtor and Creditor Law.

81.     Upon information and belief, the foregoing acts by the Guarantor, and/or the Borrower constituted: (i) fraud by the Borrower and/or the Guarantor in connection with the Loans, (ii) gross negligence or willful misconduct by the Borrower and/or the Guarantor, (iii) the removal or disposal of rents, which constitute part of the Property, after an Event of Default (as defined in the Mortgages), (iv) a misappropriation of rents from the Property following an Event of Default under the Mortgages, and (v) Events of Default under Sections 2.1.2 (viii) and (ix) of the First Mortgage.

82.     As a result of the Borrower's and the Guarantor's fraudulent transfers, malfeasance and nonfeasance, (i) the Borrower has been wrongly stripped of its assets, which would otherwise be available to maintain the Property and pay the Borrower's Loans; (ii) waste of the Property and the Borrower's assets occurred; (iii) the Loans have not been paid; and (iv) the Plaintiff has incurred and continues to incur losses and damages, including without limitation, the amounts owed to Plaintiff under the Loan Documents.

83.     By reason of, among other things, the First Loan Maturity Default, pursuant to the terms of the First Loan Documents, the First Loan is now immediately due and payable in full and Plaintiff is entitled to, among other things, foreclose on the First Mortgage.

84.     Pursuant to the First Note, upon the occurrence of any default under any of the First Loan Documents, after the expiration of applicable notice and grace periods, interest on the First Loan automatically accrues at the default rate of 24% per annum (the "**Default Rate**").

85.     The Borrower was not entitled to any notice or grace period with respect to the First Loan Events of Default.

18

554625-1

86. By reason of a default under the First Note and/or the First Mortgage, Default Rate interest has accrued and continues to accrue on the First Loan as of January 6, 2015 or such other date that the Court determines that a default first occurred.

87. All grace periods, if any, allowed in the First Loan Documents have passed, the First Loan Events of Default have not been cured, and the First Loan is now immediately due and payable in full. Under the terms and conditions of the First Loan Documents, the following amounts are now due and owing, plus all other fees and charges that may apply pursuant to the First Loan Documents:

| | |
|---|---|
| UNPAID PRINCIPAL BALANCE: | $5,775,000.00 |
| INTEREST ON THE UNPAID PRINCIPAL BALANCE: | At the Default Rate of 24.00% per annum from January 6, 2015 (or such other date that the Court determines), and thereafter. |

88. In addition to the foregoing, additional amounts are owed under the terms of the First Loan Documents. Such amounts have accrued and continue to accrue, including, without limitation, for late fees, other fees, attorneys' fees and expenses, and protective advances, and other amounts set forth in the First Loan Documents, together with interest thereon, as applicable, at the Default Rate as provided under the First Loan Documents.

**The Second Loan**

89. On or about the following date, the Borrower, for the purpose of evidencing a loan in the following principal amount, duly executed, acknowledged and delivered to the Bank, as obligee, the following instrument, a true and correct a copy of which is annexed hereto as **Exhibit "G"**, with the same force and effect as if set forth at length herein:

| | |
|---|---|
| INSTRUMENT: | Mortgage Note (the **"Second Note"**; and together with the First Note, collectively referred to herein as the **"Notes"**) |

19

554625-1

DATE:                    November 4, 2016

OBLIGOR:                 The Borrower

OBLIGEE:                 The Bank

PRINCIPAL AMOUNT:        $1,150,000.00 (the "**Second Loan**"; and together with the First
                         Loan, collectively referred to herein as the "**Loans**")

90.     The aforementioned Second Note has been lost or misplaced by the Bank, and after the Bank's exercise of due diligence, cannot be located.  The Bank's loss of possession of the Second Note was not the result of a transfer by the Bank, and the Bank has not assigned, transferred or hypothecated to any third party any portion of its interest in the Second Note.  The Bank duly executed and delivered to Plaintiff an affidavit as to the foregoing (the "**Lost Note Affidavit**"), a true and correct copy of which is annexed hereto as **Exhibit "H"**.  In addition to the foregoing, Plaintiff respectfully refers the Court to the Second Mortgage (hereinafter defined) to deem as sufficient evidence of the Borrower's indebtedness on the Second Loan.

91.     For the purpose of securing payment of the indebtedness due in connection with the Second Loan and the Second Note, the Borrower, as mortgagor, on or about said date executed, acknowledged and delivered to the Bank, as mortgagee, a certain Second Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing dated November 4, 2016 (the "**Second Mortgage**"; and together with the First Mortgage, collectively referred to herein as the "**Mortgages**"), a true and correct copy of which is annexed hereto as **Exhibit "I"**, with the same force and effect as if set forth at length herein, wherein and whereby the Borrower, as mortgagor, further mortgaged to the Bank, as mortgagee, the Property.

92.     The Second Mortgage was duly recorded as follows in the office for the recording of mortgages in the county in which said mortgaged Property was then and is now situated, and the recording data is as follows:

20

554625-1

RECORDED IN:          The Register's Office

DATE OF RECORDING:       November 14, 2016

CRFN:               2016000398372

93.     Any applicable recording tax was duly paid at the time of recording of the Second Mortgage.

94.     In order to induce the Bank to make the Second Loan to the Borrower, the Guarantor, i.e., Daniel Ross Reifer, duly executed, acknowledged and delivered to the Bank a certain Limited Guaranty dated November 4, 2016 (the "**Second Loan Guaranty**"; and together with the First Loan Guaranty, collectively referred to herein as the "**Guaranties**").  A true and correct copy of the Second Loan Guaranty is annexed hereto as **Exhibit "J"**.

95.     Guarantor received a direct benefit from the Bank making the Second Loan to the Borrower.

96.     Pursuant to the Second Loan Guaranty, the Guarantor irrevocably and unconditionally guaranteed to the Bank, and its successors and assigns (including, without limitation, the Plaintiff), the payment and performance of any and all Guaranteed Obligations (as that term is defined in the Second Loan Guaranty) as and when the same shall be due and payable.

97.     In addition, in order to further induce the Bank to make the Second Loan to the Borrower, the Borrower agreed, pursuant to that certain Violations Affidavit dated November 4, 2016 (the "**Second Loan Violations Affidavit**"), to undertake to have certain violations relating to the Property corrected within six (6) months of the date of said Second Loan Violations Affidavit.  A true and correct copy of the Second Loan Violations Affidavit is annexed hereto as **Exhibit "K"**.

21

98.     The Second Note, the Lost Note Affidavit, the Second Mortgage, the Second Loan Guaranty, and the Second Loan Violations Affidavit, together with all other documents and/or agreements that were executed and/or delivered in connection with the Second Loan, are collectively referred to herein as the "**Second Loan Documents**". The First Loan Documents and the Second Loan Documents are collectively referred to herein as the "**Loan Documents**".

99.     Pursuant to, among other things (i) an Assignment of Mortgage Without Covenant, dated as of December 11, 2019 (the "**Second Mortgage Assignment**"), and (ii) the Omnibus Assignment of Loan Documents, the Second Note, the Second Mortgage, the Second Loan Guaranty, the Second Loan Violations Affidavit and all of the other Second Loan Documents were duly assigned by the Bank to Plaintiff. A true and correct copy of the Second Mortgage Assignment is annexed hereto as **Exhibit "L"**. The Second Mortgage Assignment was sent to be recorded with the Register's Office.

100.     As a result of the above-described assignments, Plaintiff has possession of the Second Loan Documents and is now the owner and holder of the Second Loan Documents, and any and all other documents evidencing the Second Loan as such may have thereafter been modified or amended, and Plaintiff is entitled to enforce its rights under all of the Second Loan Documents.

101.     The Borrower and the Guarantor have breached their obligations under the Second Loan Documents.

102.     Multiple Events of Default under the Second Loan Documents have occurred and continue to exist, including, without limitation, those described below.

103.     Section 2.1.1. of the Second Mortgage entitled "Events of Default-Optional Acceleration" provides in pertinent part:

554625-1

"The Debt shall become due, at the option of the Mortgagee, upon the occurrence of any of the following events, which event shall be an 'Event of Default':

> (a) after default in the payment of any installment of principal or interest as provided in the [Second] Note;

> (b) after default in the payment when due and payable of any other sum of money required to be paid or expended under this [Second] Mortgage, the [Second] Note, or any other [Second] Loan Document (as hereinafter defined); . . .

> (j) the failure of the Mortgagor to perform or observe any term, covenant, condition or obligation of any bond, note, loan agreement, guarantee, or any other instrument or agreement in connection with the borrowing of money or the obtaining of advances or credit, or of any instrument given to secure the same, to which such party and Mortgagee or its affiliates are parties;

> (k) if a default beyond any applicable notice and grace period occurs under any mortgage which is prior, equal or subordinate to the lien of this Second Mortgage (including the [First] Mortgage) or the mortgagee under any such prior, equal or subordinate mortgage commences a foreclosure action in connection with said mortgage;"

104.    Section 2.1.2 of the Second Mortgage entitled "Events of Default-Automatic Acceleration" provides in pertinent part:

"The Debt shall forthwith and automatically become due, upon the occurrence of any of the following events which event shall also be an 'Event of Default':

if the [Borrower] or the Guarantor shall: ...

> (viii) conceal, remove or permit to be concealed or removed, any part of its property, with intent to hinder, delay or defraud its creditors or any of them,

23

554625-1

(ix)    make or suffer a transfer of any of its property which may be fraudulent under any bankruptcy, fraudulent conveyance or similar law,"

105.    Pursuant to paragraph 4 of the Second Loan Violations Affidavit:

"The Borrower shall undertake to have the Violations corrected within six (6) months of the date hereof. The failure to correct the Violations within such time period shall be, without notice or time to cure, a default pursuant to the [Second] Mortgage entitling the Lender to all remedies available thereunder. The Borrower shall make a good faith effort to remove said Violations of record within six (6) months from the date hereof."

106.    Section 2.2. of the Second Mortgage entitled "Remedies" provides in pertinent part:

"(a) Upon the occurrence of any Event of Default, the Mortgagee may, in addition to any rights or remedies available to it hereunder or at law, take such action as it deems advisable to protect enforce its rights against the Mortgagor and in and to the Mortgaged Property, including the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as the Mortgagee may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of the Mortgagee:

(i)    declare the entire unpaid Debt to be immediately due and payable;"

107.    As of the date hereof, at least ninety (90) of the original ninety-one (91) property violations identified in the Second Loan Violations Affidavit have not been removed and continue to remain as violations against the Property as uncorrected. Evidence demonstrating the continued existence of the very same ninety (90) property violations that existed at the origination of the Second Loan is annexed hereto as **Exhibit "M"**.

24

108.   The violations identified in the Second Loan Violations Affidavit were not removed by the date that was six (6) months from the date of the Second Loan Violations Affidavit, i.e., May 4, 2017.

109.   In an affidavit sworn to by Stanley on February 27, 2020 (the "**Stanley 2/27/20 Affidavit**"), which was filed in the Stanley's Misconduct Action, Stanley (i) acknowledged the existence of the Second Loan Violations Affidavit and the need to correct the violations set forth therein, and (ii) admitted that the violations identified in the Second Loan Violations Affidavit were not removed as required in Second Loan Violations Affidavit.

110.   All of Stanley's statements in both the Stanley 2/27/20 Affidavit and the complaint filed in the Stanley's Misconduct Action constitute statements and admissions by the Borrower, since Stanley is the sole general partner of Lincoln 95, which is the sole manager of the Debtor.

111.   The Second Loan Violations Affidavit constitutes one of the "Loan Documents" as such term is defined in the Second Note.

112.   The Borrower's failure to timely correct the violations identified in the Second Loan Violations Affidavit automatically constituted a default under the "Loan Documents" as such term is defined in the Second Note and an Event of Default under the Second Mortgage and the other Second Loan Documents, and in each case without notice or time to cure.

113.   The Borrower was not entitled to any notice or grace period with respect to, among other things, the Borrower's failure to correct the violations identified in the Second Loan Violations Affidavit within the time period set forth in the Second Loan Violations Affidavit.

114.   Accordingly, the Borrower breached its obligations under the Second Loan Documents by, among other things: (i) failing and omitting to pay the Second Loan in full on or before the December 10, 2019 maturity date of the Second Note (the "**Second Loan Maturity**

554625-1

Default"); (ii) failing and omitting to correct, and/or make a good faith effort to remove, the violations against the Property pursuant to and in accordance with the Second Loan Violations Affidavit (the "**Second Loan Violations Default**"); (iii) failing and omitting to cure the First Loan Maturity Default constituting a cross default pursuant to, among other things, Section 2.1.1(j) and 2.1.1(k) of the Second Mortgage (the "**First Loan Maturity Cross-Default**"); and (iv) committing or allowing the occurrence of acts which caused the Section 2.1.2 Defaults under the First Loan Documents, constituting cross defaults pursuant to, among other things, Sections 2.1.1(j) and 2.1.1(k) of the Second Mortgage (the "**First Loan Section 2.1.2 Cross-Defaults**").

115. In addition, other automatic Events of Default occurred under Section 2.1.2 (viii) and (ix) of the Second Mortgage as a result of the Borrower's and the Guarantor's acts to (a) conceal, remove or permit to be concealed or removed, part of the Borrower's property, with intent to hinder, delay or defraud the Borrower's creditors, and (b) make, or cause the Borrower to suffer, one or more transfers of part of the Borrower's property which may be fraudulent under any bankruptcy, fraudulent conveyance or similar law, including, but not limited to, those acts set above (such Events of Default being the "**Second Loan Section 2.1.2 Defaults**").

116. The Second Loan Maturity Default, the Second Loan Violations Default, the First Loan Maturity Cross-Default, the First Loan Section 2.1.2 Cross-Defaults, and the Second Loan Section 2.1.2 Defaults are collectively referred to the "**Second Loan Events of Default**". All of the Second Loan Events of Default constitute Events of Default as defined in the Second Loan Documents.

117. By reason of, among other things, the Second Loan Maturity Default, pursuant to the terms of the Second Loan Documents, the Second Loan is now immediately due and payable in full and Plaintiff is entitled to, among other things, foreclose on the Second Mortgage.

118.    Pursuant to the Second Note, upon the occurrence of any default under the Second Loan Documents, after the expiration of applicable notice and grace periods, interest on the Second Loan automatically accrues at the Default Rate.

119.    The Borrower was not entitled to any notice or grace period with respect to the Second Loan Events of Default.

120.    By reason of a default under the Second Note, the Second Mortgage and/or the Second Loan Violations Affidavit, Default Rate interest has accrued and continues to accrue on the Second Loan as of November 4, 2016, or such other date that the Court determines that a default first occurred.

121.    All grace periods, if any, allowed in the Second Loan Documents have passed, the Second Loan Events of Default have not been cured, and the Second Loan is now immediately due and payable in full. Under the terms and conditions of the Second Loan Documents, the following amounts are now due and owing, plus all other fees and charges that may apply pursuant to the Second Loan Documents:

| | |
|---|---|
| UNPAID PRINCIPAL BALANCE: | $1,150,000.00 |
| INTEREST ON THE UNPAID PRINCIPAL BALANCE: | At the Default Rate of 24.00% per annum from November 4, 2016 (or such other date that the Court determines), and thereafter. |

122.    In addition to the foregoing, additional amounts are owed under the terms of the Second Loan Documents.  Such amounts have accrued and continue to accrue, including, without limitation, for late fees, other fees, attorneys' fees and expenses, and protective advances, and other amounts set forth in the Second Loan Documents, together with interest thereon, as applicable, at the Default Rate as provided under the Second Loan Documents.

27

123.    The subject Loans were made to a commercial entity, were not incurred for personal, family or household purposes and the Borrower does not reside at the Property.  As a result, the Borrower was not entitled to a 90-day notice or the settlement conference required under CPLR § 3408.

124.    The Guarantor is made a party defendant to this action by virtue of the fact that he personally guaranteed all the obligations due under the Notes, as evidenced by the duly executed Guaranties annexed hereto as **Exhibit "D"** and **Exhibit "J"**, respectively.

125.    ECB is made a party defendant to this action by virtue of numerous ECB liens against the Borrower.  A copy of the docket referencing said ECB liens is annexed hereto as **Exhibit "N"**.

126.    No other action or proceeding has been commenced or maintained or is now pending at law or otherwise for the foreclosure of said Mortgages, or to recover the amounts due under the Notes.

127.    Each of the above-named defendant(s) has or claims to have or may claim to have some interest in or lien upon the mortgaged Property or some part thereof, which interest or lien, if any, has accrued subsequent to, and is subject and subordinate to, the lien of the Mortgages.

## Relief Requested

128.    Plaintiff requests that in the event that this action will proceed to judgment of foreclosure and sale, said Property should be sold subject to the following:

(a)    Any state of facts that an inspection of the Property would disclose.

(b)    Any state of facts that an accurate survey of the Property would show.

(c)    Covenants, restrictions, easements and public utility agreements of record, if any.

28

554625-1

(d)     Building and zoning ordinances of the municipality in which the mortgaged Property are located and possible violations of same.

(e)     Any rights of tenants or persons in possession of the subject Property.

(f)     Any equity of redemption of the United States of America to redeem the Property within 120 days from date of sale.

(g)     Prior mortgage liens of record held by and any advances and arrears thereunder.

(h)     Prior lien(s) of record, if any.

129.    In the event that Plaintiff possesses any other lien(s) against said mortgaged Property either by way of judgment, junior mortgage or otherwise, Plaintiff requests that other than as pleaded in this complaint such other lien(s) shall not be merged in Plaintiff's cause(s) of action set forth in this complaint, but that Plaintiff shall be permitted to enforce said other lien(s) and/or seek determination of priority thereof in any independent action(s) or proceeding(s), including, without limitation, any surplus money proceedings.

130.    Plaintiff believes that during the pendency of this action, in order to protect the security of the within Mortgages, it may be compelled to make advances to prior mortgagees, for installments of principal and interest if any, taxes, assessments, water rates, and/or insurance premiums that are or may become due or to the receiver of taxes, or to the insurance company, which advances are to be included in the balance due to Plaintiff, plus interest at the Default Rate as provided for in the Loan Documents, and all such amounts shall be deemed further secured by each of the Mortgages.

131.    Plaintiff has not and shall not be deemed to have waived, altered, released or changed the occurrence of the maturity date of the Loans or any other default or Event of Default and Plaintiff's entitlement to payment in full of the debt under the Loan Documents by reason of any payment after the date of the commencement of this action.

554625-1

## AS AND FOR A SECOND CAUSE OF ACTION

132.     Plaintiff repeats, reiterates and re-alleges each and every allegation set forth in Paragraphs "1" through and including "131" of this complaint.

133.     There appears of record to be a certain purported indenture made as of May 31, 1990 by and between the Borrower, as mortgagor, and THE COMMUNITY PRESERVATION CORPORATION ("**CPC**"), as mortgagee, pursuant to which the Property was mortgaged by the Borrower to CPC (the "**CPC Mortgage**"), which CPC Mortgage was recorded in the Register's Office on June 12, 1990 in Reel: 1700 at Page: 0874, a copy of which is annexed hereto as **Exhibit "O"**.

134.     Subsequently, on or about October 21, 1998, the CPC Mortgage was assigned by CPC to THE CITY OF NEW YORK, ACTING THROUGH ITS DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT by virtue of an Assignment of Mortgage (the "**CPC Assignment**"), which said CPC Assignment was recorded in the Register's Office on March 26, 1999 in Reel: 2844 at Page: 1491, a copy of which is annexed hereto as **Exhibit "P"**.

135.     Upon information and belief, the CPC Mortgage was paid off in full on or about May 3, 2011, prior to the origination of either of the Loans being foreclosed herein.

136.     By reason of the foregoing, and pursuant to RPAPL Article 15, this Court should direct the Clerk of the County of New York to extinguish said CPC Mortgage of record, as it has been paid off in full.

## AS AND FOR A THIRD CAUSE OF ACTION

137.     Plaintiff repeats, reiterates and re-alleges each and every allegation set forth in Paragraphs "1" through and including "136" of this complaint.

138.     The Guarantor, i.e., Daniel Ross Reifer, duly executed the Guaranties as additional security for repayment of the sums due under the Notes, wherein he personally

554625-1

guaranteed the payment of all Guaranteed Obligations, as more particularly described in each of the respective Guaranties. True and correct copies of the Guaranties are annexed hereto as **Exhibit "D"** and **Exhibit "J"**, respectively.

139. By reason of the foregoing Guaranties, Plaintiff reserves the right to seek a deficiency judgment pursuant to Real Property Actions and Proceedings Law § 1371 against the Guarantor, individually, to the extent of the liability under the Guaranties, as applicable, upon the completion the foreclosure action.

## AS AND FOR A FOURTH CAUSE OF ACTION

140. Plaintiff repeats, reiterates and re-alleges each and every allegation set forth in Paragraphs "1" through and including "139" of this complaint.

141. To further secure the Borrower's obligations under the Loan Documents, the Borrower granted to the Bank a first priority security interest in all of the Borrower's personal property located at the Property or used in connection with the Property.

142. The Bank perfected its security interest in all of the Borrower's personal property by, among other things, filing a UCC-1 financing statement (the "**UCC-1 Financing Statement**"), duly describing the collateral which was duly recorded in the office of the Secretary of State of Delaware.

143. The UCC-1 Financing Statement was assigned by the Bank to Plaintiff by, among other things, the Omnibus Assignment of Loan Documents and a UCC-3 Assignment, which UCC-3 Assignment was duly recorded in the office of the Secretary of State of Delaware.

144. By reason of the defaults and Events of Default under the Loan Documents, the obligations thereunder have become due and payable and Plaintiff is entitled to foreclose on all the Borrower's personal property in which it was granted a security interest pursuant to the Loan Documents.

31

**WHEREFORE**, the Plaintiff demands judgment that the defendants and each of them and all persons claiming under them or any of them, subsequent to the commencement of this action and the filing of a notice of pendency thereof, be barred and foreclosed of and from all estate, right, title, interest, claim, lien and equity of redemption of, in and to the Property and each and every part and parcel thereof; that the Property may be decreed to be sold in one or more parcels, according to law, subject to the terms set forth in Paragraph 128 in the First Cause of Action in this complaint; that the monies arising from the sale thereof may be brought into Court; that the Plaintiff may be paid the amount due on the Notes, Mortgages and other Loan Documents, as consolidated into one Judgment of Foreclosure and Sale with Default Rate interest from and after May 4, 2017 and late charges to the time of such payment in full, together with any prepayment penalty and fees and with the expenses of such sale, plus reasonable attorneys' fees, together with the costs, allowances and disbursements of this action, and together with any sums incurred by Plaintiff pursuant to any terms or provisions of the Notes, Mortgages and other Loan Documents, or to protect the liens of Plaintiff's Mortgages and security interests, together with Default Rate interest upon said sums from the dates of the respective payments and advances thereof, so far as the amount of such monies properly applicable thereto will pay the same; that this Court forthwith appoint a receiver of the rents and profits of the Property, during the pendency of this action with the usual powers and duties; and as and for the Second Cause of Action that the CPC Mortgage be extinguished of record; and as and for the Third Cause of Action that the defendants, **EIGHT-115 ASSOCIATES, LLC (SUCCESSOR BY CONVERSION TO EIGHT-115 ASSOCIATES, L.P.) and DANIEL ROSS REIFER**, if applicable, may be adjudged to pay the whole residue, or so much thereof as the Court may determine to be just and equitable, of the debt remaining unsatisfied after a sale of the Property and the application of the proceeds pursuant to the directions contained in the consolidated

32

Judgment of Foreclosure and Sale, and that in the event that Plaintiff possesses any other lien(s) against the Property either by way of judgment, junior mortgage or otherwise, Plaintiff requests that such other lien(s) shall not be merged in Plaintiff's cause(s) of action set forth in this complaint and that Plaintiff shall be permitted to enforce said other lien(s) and/or seek determination of priority thereof in any independent action(s) or proceeding(s), including, without limitation, any surplus money proceedings, that an order be entered compelling that the tenants deliver possession of the Property to Plaintiff, and that the Plaintiff may have such other and further relief; and as and for the Fourth Cause of Action adjudging that the personal property described in the Mortgages be sold according to the law to satisfy the amount due to the Plaintiff under all of the Loan Documents.

Dated:  New York, New York
       March 12, 2020

KATSKY KORINS LLP
*Attorneys for Plaintiff*

By: _____
     Steven H. Newman, Esq.
     Robert A. Abrams, Esq.
605 Third Avenue
New York, New York 10158
(212) 953-6000

33

ATTORNEY CERTIFICATION PURSUANT

TO

22 NYCRR 130-1.1a

Pursuant to 22 NYCRR 130-1.1a, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that upon information and belief, and after reasonable inquiry, the contentions contained in the annexed document(s) are not frivolous.

Dated: March 12, 2020

_____

Steven H. Newman, Esq.

34

# **VERIFICATION**

STATE OF NEW YORK   )
                       ) ss.:
COUNTY OF NEW YORK   )

      DAVID AVIRAM, being duly sworn, deposes and says that he is a Manager of

HARLEM MULTIFAMILY LLC, the Plaintiff in this action, that he has read the foregoing

Amended Verified Complaint and knows the contents thereof, and that the same is true to his

knowledge.

 

                                         _____

                                       DAVID AVIRAM, *Manager*

Sworn to before me on this
12th day of March 2020

_____
Notary Public

**JASON LEIBOWITZ**
Notary Public, State of New York
No.02LE6167317
Qualified in Suffolk County
Commission Expires 7/22/23

# Exhibit A

(Immediately Follows This Page)

## AMENDED, CONSOLIDATED AND RESTATED MORTGAGE NOTE

$5,775,000.00

Melville, New York
November 25, 2014

FOR VALUE RECEIVED, the undersigned, EIGHT-115 ASSOCIATES, LLC (successor by conversion to Eight-115 Associates, L.P.), a Delaware limited liability company, having an address at c/o RMC Equities, LLC, 26 Court Street, Suite 2304, Brooklyn, New York 11242 (the "Borrower") promises to pay to the order of SIGNATURE BANK, a New York banking corporation (the "Bank") having an office at 68 South Service Road, Melville, New York 11747 (or such other place designated by the holder of this Note in writing) the principal sum of FIVE MILLION SEVEN HUNDRED SEVENTY FIVE THOUSAND AND 00/100 DOLLARS ($5,775,000.00), together with interest thereon from the date hereof at the rates set forth herein and in accordance with the terms and conditions hereof.

1. Interest

Until the Maturity Date (as defined in Section 2 below), the outstanding sum on this Note shall bear interest at an annual rate of interest equal at all times to 3.375%. If the Borrower elects to extend the Maturity Date for an extended term, as provided in Section 2 below, for the extended term, the outstanding sum shall bear interest at an annual rate of interest equal at all times to the greater of (i) 3.375% or (ii) two hundred seventy five (275) basis points in excess of the weekly average yield on United States Treasury Securities adjusted to a constant maturity of five (5) years as most recently made available by the Federal Reserve Board as of thirty (30) days prior to the first (1st) day of the extended period.

Interest shall be payable on the date hereof for interest through December 9, 2014. Thereafter, interest shall be payable on the tenth (10th) day of each month in arrears beginning January 10, 2015 and shall be calculated on the outstanding principal balance from time to time and based upon the actual number of days elapsed divided by 360.

2. Principal Payments

The outstanding principal shall be payable in monthly installments of principal and interest (calculated in accordance with a thirty (30) year amortization schedule), beginning on January 10, 2015 and continuing on the tenth (10th) day of each month thereafter. The amount of each installment of principal and interest shall equal $25,531.06. The final monthly installment, which shall be due and payable on December 10, 2019 (the "Maturity Date"), shall equal all outstanding principal together with all accrued and unpaid interest. Pursuant to Section 14 herein, the Borrower shall have the option of extending the Maturity Date for one (1) additional five (5) year term (the "Extension Period").

1

3. Prepayments

The principal balance may be prepaid in whole or in part at any time provided that the Borrower shall pay to the Bank with each such prepayment a prepayment fee equal to: (i) from and including the date hereof through and including December 9, 2015 and, if applicable, from December 10, 2019 through and including December 9, 2020, five percent (5%) of the amount of such prepayment; (ii) from and including December 10, 2015 through and including December 9, 2016 and, if applicable, from and including December 10, 2020 through and including December 9, 2021, four percent (4%) of the amount of such prepayment; (iii) from and including December 10, 2016 through and including December 9, 2017 and, if applicable, from and including December 10, 2021 through December 9, 2022, three percent (3%) of the amount of such prepayment; (iv) from and including December 10, 2017 through and including December 9, 2018 and, if applicable, from and including December 10, 2022 through December 9, 2023, two percent (2%) of the amount of such prepayment; and (v) from and including December 10, 2018 through and including the sixty-first (61st) day prior to the Maturity Date and, if applicable, from and including December 10, 2023 through the sixty-first (61st) day prior to the end of the Extension Period, one percent (1%) of the amount of such prepayment. There shall be no prepayment fee during the sixty (60) day period immediately preceding the Maturity Date or the last sixty (60) days of the Extension Period. All partial prepayments shall be in the minimum amount of $25,000.00 and integral multiples thereof and shall be applied in the inverse order of their maturity. All prepayments shall be accompanied by accrued and unpaid interest through the date of prepayment. Amounts prepaid may not be re-borrowed.

4. Participations, Etc.

(a) The Bank shall have the right at any time, with or without notice to the Borrower, to sell, assign, transfer or negotiate all or any part of this Note or grant participations therein. The Borrower agrees and consents to the Bank providing financial and other information regarding its business and operations to prospective purchasers or participants and further agrees that to the extent that the Bank should sell, assign, transfer or negotiate all or any part of this Note, the Bank shall be forever released and discharged from its obligations under this Note to the extent same is sold, assigned, transferred or negotiated.

(b) Any purchaser, assignee, transferee or participant shall have the same rights, benefits and obligations under this Note as it would have if it were the Bank.

5. Payments

The Borrower agrees that all payments due under this Note shall be made by automatic debit from account no. ▓▓▓▓▓▓, an account maintained by the Borrower at the Bank, in which the Borrower shall maintain balances sufficient to pay each monthly payment due to the Bank under this Note. In the event that the money maintained in such account is insufficient for any payment due under this Note, the Bank may charge any account of the Borrower for any payment due to the Bank under this Note. Time is of the essence as to all dates set forth herein, provided, however, that

2

whenever any payment is to be made under this Note shall be stated to be due on a Saturday, Sunday or a public holiday or the equivalent for banks generally under the laws of the State of New York (any other day being a "Business Day"), such payment may be made on the next succeeding Business Day.

6. Interest Adjustments

(a) If the provisions of this Note would at any time otherwise require payment by the Borrower to the Bank of any amount of interest in excess of the maximum amount then permitted by applicable law the interest payments shall be reduced to the extent necessary so that the Bank shall not receive interest in excess of such maximum amount. To the extent that, pursuant to the foregoing sentence, the Bank shall receive interest payments hereunder in an amount less than the amount otherwise provided, such deficit (hereinafter called the "Interest Deficit") will cumulate and will be carried forward (without interest) until the payment in full of this Note. Interest otherwise payable to the Bank hereunder for any subsequent period shall be increased by such maximum amount of the Interest Deficit that may be so added without causing the Bank to receive interest in excess of the maximum amount then permitted by applicable law.

(b) The amount of the Interest Deficit shall be treated as a prepayment fee and paid in full at the time of any optional prepayment by the Borrower to the Bank of this Note. The amount of the Interest Deficit relating to this Note at the time of any complete payment of this Note at that time outstanding (other than an optional prepayment thereof) shall be cancelled and not paid.

7. Agreements Relating to this Note

This Note is executed in connection with, and is secured by, inter alia, (i) mortgages which have been consolidated and modified pursuant to a Mortgage Consolidation, Modification, Security Agreement and Fixture Filing of even date herewith between the Borrower and the Bank (which, as now exists, and as the same may hereafter, from time to time, be amended, modified, extended, consolidated, increased, supplemented, spread or restated is hereinafter referred to as the "Mortgage") covering the premises located at 264 West 115th Street, 276 West 115th Street, 278 West 115th Street, 2124 Frederick Douglass Boulevard a/k/a 2124 8th Avenue, 2120 Frederick Douglass Boulevard a/k/a 2120B Frederick Douglass Boulevard a/k/a 2120 8th Avenue a/k/a 2120B 8th Avenue and 2122 Frederick Douglass Boulevard a/k/a 2122 8th Avenue, New York, New York (the "Premises") as more particularly described in the Mortgage; (ii) an assignment by the Borrower to the Bank of all leases relating to the Premises (the "Assignment of Leases"); (iii) a limited guaranty of even date herewith (the "Limited Guaranty") from Daniel Reifer (the "Guarantor") to the Bank; and (iv) an environmental indemnity agreement of even date herewith from the Borrower and the Guarantor to the Bank (the "Indemnity Agreement") (this Note, the Mortgage, the Assignment of Leases, the Limited Guaranty, the Indemnity Agreement and all other documents executed in connection with the loan evidenced by this Note collectively, the "Loan Documents"). This Note is subject to all the terms and conditions of the Loan Documents as if fully set forth herein.

3

8. <u>Default and Late Charge</u>

There shall be a late charge imposed equal to five percent (5%) of the amount of any payment which cannot be debited on its due date (with the exception of the payment due at maturity or acceleration).

The entire principal sum together with accrued interest thereon shall become due and payable at the option of the Bank upon any default hereunder beyond any applicable notice and grace period or upon the happening of an event constituting a default under the Loan Documents beyond any applicable notice and grace period.

Upon default under the Loan Documents after the expiration of all applicable notice and grace periods or upon maturity of this Note (whether by acceleration or otherwise) or upon the failure to supply the records and other information required in Section 12 hereof and until such records and/or information are furnished, the interest payable on this Note shall be at the rate of twenty-four percent (24%) per annum or the maximum rate allowed to be charged by law, whichever is lower.

The Bank shall be entitled to receive interest at the highest rate allowed by law on any claim filed by it pursuant to the United States Bankruptcy Code, as amended, to recover all or part of the amounts that may be due under this Note.

9. <u>Right of Set Off</u>

The Borrower hereby grants to the Bank a security interest in all deposit accounts maintained by the Borrower with the Bank and in any securities pledged or assigned to and in the possession of the Bank, which property may be applied to amounts owed under this Note.

10. <u>Governing Law</u>

This Note shall be governed and construed in accordance with the laws of the State of New York. In no event will interest be charged or collected hereunder at a rate in excess of that permitted by applicable law.

11. <u>Trial By Jury</u>

The Borrower and the Bank hereby agree to waive the right to a trial by jury in any action on or related to this Note or any other document executed in connection with this Note.

12. <u>Financial Statements</u>

The Borrower and the Guarantor shall deliver or cause to be delivered to the Bank the following:

(i) as soon as available and in any event within sixty (60) days after notice from the Bank, a rent roll for the Premises, in form and substance satisfactory to the Bank, certified to be true

4

and correct by the Borrower;

(ii) as soon as available and in any event within sixty (60) days after notice from the Bank, an income and expense statement for the prior fiscal year for the Premises, in form and substance reasonably satisfactory to the Bank and certified to be true and correct by the Borrower; and

(iii) such other information as the Bank may reasonably request from time to time.

13. Operating Account(s); Tenant Security Deposits

The Borrower shall maintain all of its operating accounts with the Bank.

All tenant security deposits for any leases of the Premises, if any, shall be maintained in an account of the Borrower with the Bank. On the date hereof the tenant security deposit account shall be funded with the actual security deposits set forth in the leases of the Premises. Notwithstanding the foregoing, in lieu of the foregoing, the Borrower may maintain on deposit in an account of the Borrower with the Bank a balance of not less than the aggregate amount of all security deposits under all leases for the Premises.

14. Extension of Maturity Date for Extension Period

Provided (i) no default or Event of Default (as defined in the Mortgage) has occurred and is continuing beyond any applicable grace and/or cure period, (ii) the Borrower has maintained a satisfactory payment history on this Note (a payment has not been made more than thirty (30) days late more than two (2) times in any twelve (12) month period), and (iii) the net operating income at the Premises from written leases then in effect before depreciation, amortization and interest expense is not less than 1.3 times the amount of the anticipated annual fixed monthly payments of interest and principal payable on this Note during the Extension Period, the Borrower may request that the Maturity Date be extended for one (1) five (5) year period provided the Borrower complies with the following additional terms and conditions:

(i)      The Bank shall have received a written request from the Borrower for such extension at least sixty (60) days prior to the Maturity Date which request is accompanied by a current rent roll, the most recent annual income and expense statement of the Premises, payment to the Bank of the sum of $150.00 for a property inspection fee and payment to the Bank of a tax service fee in an amount to be determined at the time of such extension;

(ii)      The Bank shall have received an updated appraisal of the Premises (prepared at the Borrower's expense) which shall be satisfactory to the Bank in all respects and shall confirm that the principal amount outstanding on this Note does not exceed seventy-five percent (75%) of the then appraised value of the Premises. If the amount of this Note at the time of such extension exceeds seventy-five percent (75%) of the appraised value, the Borrower may make a prepayment on this Note to meet the loan to value ratio without any prepayment fee;

5

(iii)     The Bank shall be provided with an updated title search of the Premises and/or insurance, at the Bank's reasonable discretion, and such other documents and information as the Bank may request which shall be reasonably satisfactory to the Bank in all respects;

(iv)     The Borrower and the Guarantor shall execute such documents as the Bank and its counsel deem necessary to evidence such extension, including, without limitation, a modification and extension agreement (the "Modification Agreement") which modifies and extends this Note and the Mortgage and a reaffirmation of the obligations of the Guarantor under the Limited Guaranty and the Indemnity Agreement;

(v)     The Borrower shall be responsible for all costs and expenses associated with such extension, including, but not limited to, the Bank's reasonable legal fees, recording fees, title insurance premiums, survey expenses, appraisal fees and environmental fees, if any.

In the event this Note is extended pursuant hereto, the interest rate on this Note shall be readjusted on the date this Note is extended pursuant to Section 1 herein. The Borrower shall continue to make monthly payments of principal and interest on this Note. The amount of each monthly installment shall be recalculated on the first (1st) day of the Extension Period based upon the adjusted interest rate on this Note, the outstanding principal amount as of the first (1st) day of the Extension Period and an amortization schedule of twenty-five (25) years. All other terms and conditions of this Note and the other Loan Documents shall remain in full force and effect during the Extension Period. The terms and conditions of the Modification Agreement shall contain the same terms and conditions of the Mortgage, this Note and any other Loan Documents executed in connection herewith, including, but not limited to, the prepayment provisions set forth in this Note.

## 15. Miscellaneous

The Borrower and any endorsers or guarantors of this Note for themselves, their heirs, legal representatives, successors and assigns, respectively and severally waive presentment, demand, protest and notice of dishonor and waive any right to be released by reason of any extension of time, delay in enforcement or change in terms of payment or any change, alteration or release of any security given for the payment hereof, and jointly and severally agree to pay any costs and expenses, including attorneys' fees if, upon default hereunder or under the Loan Documents, same are incurred to secure collection hereof.

This Note can only be amended, modified, or cancelled in writing signed by the Bank.

-Balance of Page Intentionally Left Blank-

6

16. Consolidation and Restatement

This Note is being executed and delivered as a consolidation and restatement of the outstanding indebtedness evidenced by those certain notes set forth in Exhibit A annexed hereto (hereinafter collectively referred as the "Original Notes") and secured by the Mortgage. The consolidated indebtedness evidenced by this Note constitutes (i) a consolidation of the indebtedness evidenced by the Original Notes to form a single note and indebtedness evidencing an outstanding principal indebtedness of $5,775,000.00 and (ii) a total restatement of the indebtedness evidenced by the Original Notes in the current outstanding aggregate amounts due thereunder of $5,775,000.00. This Note shall not constitute a cancellation or novation with respect to the indebtedness evidenced by the Original Notes. Such indebtedness (as heretofore evidenced by the Original Notes and as hereafter evidenced by this Note) shall continue to be secured by, inter alia, the Mortgage without interruption in the lien or priority thereof. Subject to the foregoing provisions this Note amends, restates and supersedes the Original Notes.

IN PRESENCE OF:

EIGHT-115 ASSOCIATES, LLC

By: Lincoln 95 Associates, L.P.,
its sole member

By
Name: Stanley Reifer
Title:  General Partner

STATE OF NEW YORK        )
                         ) ss.:
COUNTY OF SUFFOLK        )

On the 25th day of November in the year 2014, before me, the undersigned, personally appeared Stanley Reifer, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

Notary Public

WENDY TOULAS
Notary Public, State of New York
No. 02TO6106920
Qualified in Nassau County
Commission Expires March 15, 20__

7

EXHIBIT A

ORIGINAL NOTES

The Original Notes are those notes secured by the following mortgages:

1. First Building Loan Mortgage dated May 31, 1990 made by Eight-115 Associates to The Community Preservation Corporation in the principal amount of $987,000.00 and recorded in the Office of the City Register of New York County (the "Register's Office") on June 12, 1990 in Reel 1700, Page 844;

   Which mortgage was assigned by an Assignment of Mortgage dated October 21, 1998 from The Community Preservation Corporation to M & T Real Estate, Inc. and recorded in the Register's Office on February 11, 1999 in Reel 2818, Page 1650;

2. Mortgage dated as of January 7, 1999 made by Eight-115 Associates, L.P. to M & T Real Estate, Inc. in the principal amount of $65,308.08 and recorded in the Register's Office on February 11, 1999 in Reel 2818, Page 1653;

   Which mortgages 1 and 2 above were consolidated to form a single lien in the amount of $1,045,000.00 pursuant to a Consolidation and Extension Agreement dated as of January 7, 1999 between Eight-115 Associates, L.P. and M & T Real Estate Inc. and recorded in the Register's Office on February 11, 1999 in Reel 2818, Page 1664;

   Which mortgages 1 and 2, as consolidated, were assigned by an Assignment of Mortgage dated April 25, 2011 from M & T Real Estate Trust, successor-in-interest by merger to M & T Real Estate, Inc. to Signature Bank and recorded in the Register's Office on June 14, 2011 as CRFN 2011000209105;

3. Gap Mortgage and Security Agreement dated May 2, 2011 made by Eight-115 Associates, L.P. to Signature Bank in the principal amount of $3,293,565.91 and recorded in the Register's Office on June 14, 2011 as CRFN 2011000209106;

   Which mortgages 1 and 2, as consolidated, and mortgage 3 were consolidated to form a single lien in the amount of $3,600,000.00 pursuant to a Consolidated, Amended and Restated Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing dated May 2, 2011 between Eight-115 Associates, L.P. and Signature Bank and recorded in the Register's Office on June 14, 2011 as CRFN 2011000209107 and on which mortgage there is currently outstanding the principal amount of $3,412,788.59; and

4. Gap Mortgaged Dated November 25, 2014 made by Eight-115 Associates, LLC (successor by conversion to Eight-115 Associates, L.P.) to Signature Bank in the principal amount of $2,362,211.41 and submitted for recording in the Register's Office.

8

## ALLONGE

The undersigned hereby transfers and endorses to Harlem Multifamily LLC that certain Amended, Consolidated and Restated Mortgage Note dated November 25, 2014 in the principal amount of Five Million Seven Hundred Seventy Five Thousand and 00/100 Dollars ($5,775,000.00) made by Eight-115 Associates, LLC (successor by conversion to Eight-115 Associates, L.P.) payable to Signature Bank, which has been firmly affixed hereto and has become an extension and part hereof. This transfer and endorsement is made without recourse, representations, warranties or covenants of any kind, written or oral, express or implied, by the undersigned.

This Allonge is hereby executed by the undersigned as of the 11th day of December, 2019.

SIGNATURE BANK

By:

Name: Kenneth A. Stagnari

Title:  Group Director – Vice President

# Exhibit B

(Immediately Follows This Page)



**2015010600871002002EAEEE**

## RECORDING AND ENDORSEMENT COVER PAGE

PAGE 1 OF 47

| | | |
|---|---|---|
| Document ID: **2015010600871002** | Document Date: 11-25-2014 | Preparation Date: 01-06-2015 |

Document Type: **AGREEMENT**
Document Page Count: **45**

| PRESENTER: | RETURN TO: |
|---|---|
| CONTINETAL ABSTRACT LLC P/U DENNISE ANTEQUERRA<br>1 OLD COUNTRY ROAD - SUITE 467<br>AGENT OF M354670<br>CARLE PLACE, NY 11514<br>516-248-1180 | CONTINETAL ABSTRACT LLC P/U DENNISE ANTEQUERRA<br>1 OLD COUNTRY ROAD - SUITE 467<br>AGENT OF M354670<br>CARLE PLACE, NY 11514<br>516-248-1180 |

### PROPERTY DATA

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 1830 | 53 | Entire Lot | 264 WEST 115 STREET |

Property Type: APARTMENT BUILDING

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 1830 | 59 | Entire Lot | 276 WEST 115 STREET |

Property Type: APARTMENT BUILDING

☒ Additional  Properties on Continuation  Page

### CROSS REFERENCE DATA

MANHATTAN    **Year:** 1990    **Reel:** 1700    **Page:** 844
☒ Additional  Cross References on Continuation  Page

### PARTIES

| PARTY 1: | PARTY 2: |
|---|---|
| EIGHT- 115 ASSOCIATES, LLC<br>C/O RMC EQUITIES- 26 COURT STREET, SUITE 2304<br>BROOKLYN, NY 11242 | SIGNATURE BANK<br>68 SOUTH SERVICE ROAD<br>MELVILLE, NY 11747 |

☒ Additional  Parties Listed on Continuation  Page

### FEES AND TAXES

| Mortgage : | | | Filing Fee: | | |
|---|---|---|---|---|---|
| Mortgage Amount: | $ | 5,775,000.00 | | $ | 0.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax: | | |
| Exemption: | | 255 | | $ | 0.00 |
| TAXES:  County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | | |
| City (Additional): | $ | 0.00 | | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | | | |
| TASF: | $ | 0.00 | | | |
| MTA: | $ | 0.00 | | | |
| NYCTA: | $ | 0.00 | | | |
| Additional MRT: | $ | 0.00 | | | |
| TOTAL: | $ | 0.00 | | | |
| Recording Fee: | $ | 277.00 | | | |
| Affidavit Fee: | $ | 8.00 | | | |

**RECORDED OR FILED IN THE OFFICE OF THE CITY REGISTER OF THE CITY OF NEW YORK**

Recorded/Filed        01-12-2015 17:09
City Register File No.(CRFN):
                  2015000013563

*Annette M Hill*

*City Register Official Signature*



| NYC DEPARTMENT OF FINANCE OFFICE OF THE CITY REGISTER | |
|---|---|

2015010600871002002CAC6E

| RECORDING AND ENDORSEMENT COVER PAGE (CONTINUATION) | | PAGE 2 OF 47 |
|---|---|---|
| Document ID: 2015010600871002 | Document Date: 11-25-2014 | Preparation Date: 01-06-2015 |
| Document Type: AGREEMENT | | |

## PROPERTY DATA

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 1830 | 60 | Entire Lot | 278 WEST 115 STREET |
| Property Type: APARTMENT BUILDING | | | | |
| Borough | Block | Lot | Unit | Address |
| MANHATTAN | 1830 | 63 | Entire Lot | 2124 FREDRICK DOUGLASS BL |
| Property Type: APARTMENT BUILDING | | | | |
| Borough | Block | Lot | Unit | Address |
| MANHATTAN | 1830 | 64 | Entire Lot | 2120 FREDRICK DOUGLASS BL |
| Property Type: APARTMENT BUILDING | | | | |
| Borough | Block | Lot | Unit | Address |
| MANHATTAN | 1830 | 163 | Entire Lot | 2122 FREDRICK DOUGLASS BL |
| Property Type: APARTMENT BUILDING | | | | |

## CROSS REFERENCE DATA

MANHATTAN   Year: 1999   Reel: 2818   Page: 1653
CRFN: 2011000209106
Document ID: 2015010600871001

## PARTIES

**PARTY 1:**
EIGHT-115 ASSOCIATES, L.P.
C/O RMC EQUITIES, LLC - 26 COURT STREET, SUITE 2304
BROOKYN, NY 11242

FILE NO.:   00145-01080
TITLE NO.:  M354670
PREMISES:  264 West 115th Street, 276 West 115th Street, 278 West 115th Street, 2124 Frederick Douglass Boulevard a/k/a 2124 8th Avenue, 2120 Frederick Douglass Boulevard a/k/a 2120B Frederick Douglass Boulevard a/k/a 2120 8th Avenue a/k/a 2120B 8th Avenue and 2122 Frederick Douglass Boulevard a/k/a 2122 8th Avenue, New York, New York

Section:   7
Block:    1830
Lots:     53, 59, 60, 63, 64 and 163
County:   New York

---

## EIGHT-115 ASSOCIATES, LLC
### (SUCCESSOR BY CONVERSION TO EIGHT-115 ASSOCIATES, L.P.)

with

### SIGNATURE BANK

---

### MORTGAGE CONSOLIDATION, MODIFICATION, SECURITY AGREEMENT AND FIXTURE FILING

---

RECORD AND RETURN BY MAIL TO:

Cullen and Dykman LLP
100 Quentin Roosevelt Boulevard
Garden City, New York 11530
Attention: Amy F. Hecht, Esq.

1

**MORTGAGE CONSOLIDATION, MODIFICATION,
SECURITY AGREEMENT AND FIXTURE FILING**
(this "Mortgage")

made November 25, 2014

BETWEEN

**SIGNATURE BANK**, a New York banking corporation, having an office at 68 South
Service Road, Melville, New York 11747 (the "Mortgagee"),

AND

**EIGHT-115 ASSOCIATES, LLC (successor by conversion to Eight-115 Associates,
L.P.)**, a Delaware limited liability company, having an address at c/o RMC Equities, LLC, 26
Court Street, Suite 2304, Brooklyn, New York 11242 (the "Mortgagor").

## W I T N E S S E T H :

WHEREAS, the Mortgagee is the owner and holder of the mortgages described in
Exhibit A annexed hereto and made a part hereof (hereinafter collectively referred to as the
"Existing Mortgages"), and of the notes and bonds secured thereby (hereinafter collectively
referred to as the "Existing Notes");

WHEREAS, the Existing Mortgages are a lien upon the property described in Schedule A
annexed hereto and made a part hereof (which is described in this Mortgage as the "Mortgaged
Property");

WHEREAS, pursuant to that certain Amended, Consolidated and Restated Mortgage
Note, dated the date hereof from Mortgagor to Mortgagee, the parties have consolidated the
indebtedness evidenced by the Existing Notes and amended and restated the terms of the
Existing Notes and secured by the Existing Mortgages as consolidated and coordinated pursuant
to the terms hereof (the term "Note" shall hereinafter mean and refer to the Existing Notes as so
consolidated, amended and restated on the date hereof and as the same may hereafter, from time
to time, be extended, amended, modified, restated or superseded);

WHEREAS, the Mortgagee, the owner and holder of the Note and the Existing
Mortgages, and the Mortgagor, the owner in fee simple of the Mortgaged Property, have
mutually agreed to modify the terms of the Existing Mortgages to conform to the terms hereof
and to consolidate and coordinate the lien of the Existing Mortgages so that they shall constitute
in law but one mortgage and a single unified lien upon the property described therein and herein
in the aggregate sum of FIVE MILLION SEVEN HUNDRED SEVENTY FIVE THOUSAND
AND 00/100 DOLLARS ($5,775,000.00);

NOW, THEREFORE, in pursuant of said agreement and in consideration of the sum of
One Dollar and other valuable consideration each to the other in hand paid, receipt of which is
hereby acknowledged, the parties hereto mutually covenant and agree as follows:

2

1.    The Mortgagor represents, warrants and agrees with the Mortgagee as follows:

(a)    The principal sum of FIVE MILLION SEVEN HUNDRED SEVENTY FIVE THOUSAND AND 00/100 DOLLARS ($5,775,000.00) is now due and owing under the Note, without any offset, defense or counterclaim whatsoever.

(b)    The Existing Mortgages are in full force and effect and have not been modified.

(c)    The Existing Mortgages, the Note and all documents executed and delivered in connection with this Agreement have been duly authorized, executed and delivered by the Mortgagor and constitute legal, valid and binding obligations of the Mortgagor, enforceable against the Mortgagor in accordance with their respective terms without offset, defense or counterclaim.

(d)    The Existing Mortgages are a valid first mortgage lien in favor of the Mortgagee on the Mortgaged Property, securing the indebtedness evidenced by the Existing Notes.

(e)    The Mortgagor is the sole owner of the Mortgaged Property, and no mortgage, ground leasehold interest, judgment or other lien encumbers the Mortgaged Property (other than the Existing Mortgages).

(f)    All real estate taxes and municipality charges in respect of the Mortgaged Property have been paid as of the date hereof.

(g)    No material adverse change in the financial condition of the Mortgagor has occurred since the date of the most recent financial statement of the Mortgagor delivered to the Mortgagee.

(h)    There is no action, suit or proceeding pending or threatened against or affecting the Mortgagor or the Mortgaged Property.

(i)    The Mortgaged Property has not been damaged or destroyed by fire or other casualty, and no condemnation or eminent domain proceedings have been commenced with respect to the Mortgaged Property and, to the best of the Mortgagor's knowledge, no such condemnation or eminent domain proceeding is threatened.

(j)    The Mortgaged Property is being used and operated in compliance with all applicable laws.

2.    Mortgagor hereby assumes the obligations under the Existing Mortgages and Existing Notes as modified hereby and by the Note. The liens of the Existing Mortgages are hereby consolidated and coordinated so that they shall hereafter constitute in law but one mortgage, a single lien, upon the Mortgaged Property.

3

3. The terms of the Existing Mortgages are hereby modified, restated, superseded, subsumed into, and controlled by the terms, covenants, provisions, and conditions contained in this Agreement as set forth in Exhibit B annexed hereto and made a part hereof. Mortgagor and Mortgagee hereby agree that, when the terms, covenants or provisions contained in the Existing Mortgages conflict with the terms, covenants, provisions, and conditions contained in Exhibit B hereto, the terms, covenants, provisions and conditions contained in Exhibit B hereto shall prevail except that nothing herein will extinguish, impair, limit, discharge, cancel or diminish the lien of the Existing Mortgages as herein consolidated,

EIGHT-115 ASSOCIATES, LLC

By: Lincoln 85 Associates, L.P.,
its sole member

By: _____
Name: Stanley Reifer
Title:   General Partner

SIGNATURE BANK

By: _____
Name: Kenneth A. Stagnari
Title:   Vice President

STATE OF NEW YORK    )
                        ) ss.:
COUNTY OF SUFFOLK   )

On the 25th day of November in the year 2014, before me, the undersigned, personally appeared Stanley Reifer, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

WENDY TOULAS
Notary Public, State of New York
No. 02TO6106920
Qualified in Nassau County
Commission Expires March 15, 20_16_

_Wendy Toulas_
Notary Public

SEAL

STATE OF NEW YORK    )
                        ) ss.:
COUNTY OF SUFFOLK   )

On the 25th day of November in the year 2014, before me, the undersigned, personally appeared Kenneth A. Stagnari, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

WENDY TOULAS
Notary Public, State of New York
No. 02TO6106920
Qualified in Nassau County
Commission Expires March 15, 20_16_

_Wendy Toulas_
Notary Public

SEAL

5

63

SCHEDULE A

Property Description

264 West 115th Street
New York, New York
Block 1830
Lot 53

ALL that certain plot, piece or parcel of land, Situate, lying and being in the Borough of Manhattan, City and County of New York, State of New York, bounded and described as follows:

BEGINNING at a point on the Southerly side of West One Hundred and Fifteenth Street, distant four hundred and seventy-five feet Westerly from the corner formed by the intersection of the Southerly side of West One Hundred and Fifteenth Street and the Westerly side of Seventh Avenue;

RUNNING THENCE Southerly parallel with the Easterly side of Eighth Avenue and part of the distance through a party wall, one hundred eleven inches to the center line of the block;

THENCE Westerly along the center line of the block, twenty-five feet;

THENCE Northerly parallel with the Easterly side of Eighth Avenue 100 feet 11 inches to the Southerly side of One Hundred and Fifteenth Street;

THENCE Easterly along the southerly side of One Hundred Fifteenth Street 25 feet to the point or place of BEGINNING.


276-278 West 115th Street
New York, New York
Block 1830
Lots 60 and 59

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the Southerly side of 115th Street distant 100 feet Easterly from the Southeasterly corner of 115th Street and 8th Avenue;

RUNNING THENCE Southerly parallel with 8th Avenue 100 feet 11 inches;

THENCE Easterly parallel with 115th Street 50 feet;

THENCE Northerly parallel with 8th Avenue 100 feet 11 inches to the Southerly side of 115th Street;

THENCE Westerly along the Southerly side of 115th Street 50 feet to the point or place of BEGINNING.

6

2120-2124 Frederick Douglass Boulevard
New York, New York
Block 1830
Lots 64, 163 and 63

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the Easterly side of Frederick Douglass Boulevard distant 40 feet 11 inches Southerly from the corner formed by the intersection of the Southerly side of West 115th Street and the said Easterly side of Frederick Douglass Boulevard;

RUNNING THENCE Easterly parallel with 115th Street and part of the way through a party wall 80 feet;

THENCE Southerly parallel with 8th Avenue 60 feet;

THENCE Westerly parallel with West 115th Street 80 feet to the Easterly side of Frederick Douglass Boulevard;

THENCE Northerly along said Easterly side of Frederick Douglass Boulevard 60 feet to the point or place of BEGINNING.

7

# EXHIBIT A

## Mortgage Description

1. First Building Loan Mortgage dated May 31, 1990 made by Eight-115 Associates to The Community Preservation Corporation in the principal amount of $987,000.00 and recorded in the Office of the City Register of New York County (the "Register's Office") on June 12, 1990 in Reel 1700, Page 844;

   Which mortgage was assigned by an Assignment of Mortgage dated October 21, 1998 from The Community Preservation Corporation to M & T Real Estate, Inc. and recorded in the Register's Office on February 11, 1999 in Reel 2818, Page 1650;

2. Mortgage dated as of January 7, 1999 made by Eight-115 Associates, L.P. to M & T Real Estate, Inc. in the principal amount of $65,308.08 and recorded in the Register's Office on February 11, 1999 in Reel 2818, Page 1653;

   Which mortgages 1 and 2 above were consolidated to form a single lien in the amount of $1,045,000.00 pursuant to a Consolidation and Extension Agreement dated as of January 7, 1999 between Eight-115 Associates, L.P. and M & T Real Estate Inc. and recorded in the Register's Office on February 11, 1999 in Reel 2818, Page 1664;

   Which mortgages 1 and 2, as consolidated, were assigned by an Assignment of Mortgage dated April 25, 2011 from M & T Real Estate Trust, successor-in-interest by merger to M & T Real Estate, Inc. to Signature Bank and recorded in the Register's Office on June 14, 2011 as CRFN 2011000209105;

3. Gap Mortgage and Security Agreement dated May 2, 2011 made by Eight-115 Associates, L.P. to Signature Bank in the principal amount of $3,293,565.91 and recorded in the Register's Office on June 14, 2011 as CRFN 2011000209106;

   Which mortgages 1 and 2, as consolidated, and mortgage 3 were consolidated to form a single lien in the amount of $3,600,000.00 pursuant to a Consolidated, Amended and Restated Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing dated May 2, 2011 between Eight-115 Associates, L.P. and Signature Bank and recorded in the Register's Office on June 14, 2011 as CRFN 2011000209107;

   Which mortgages 1 and 2, as consolidated, were modified pursuant to an Agreement of Consolidation and Modification of Mortgage and Note dated May 2, 2011 between Eight-115 Associates, L.P. and Signature Bank and recorded in the Register's Office on June 14, 2011 as CRFN 2011000209108 and on which mortgage there is currently outstanding the principal amount of $3,412,788.59; and

4. Gap Mortgaged Dated November 25, 2014 made by Eight-115 Associates, LLC (successor by conversion to Eight-115 Associates, L.P.) to Signature Bank in the principal amount of $2,362,211.41 and submitted for recording in the Register's Office.

EXHIBIT B

Restated Mortgage

MORTGAGE, SECURITY AGREEMENT,
ASSIGNMENT OF LEASES AND RENTS AND FIXTURE FILING

By

EIGHT-115 ASSOCIATES, LLC
(SUCCESSOR BY CONVERSION TO EIGHT-115 ASSOCIATES, L.P.)

In Favor of

SIGNATURE BANK

THIS MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF LEASES AND RENTS AND FIXTURE FILING made this 25th day of November, 2014, by EIGHT-115 ASSOCIATES, LLC (successor by conversion to Eight-115 Associates, L.P.), a Delaware limited liability company, having an address at c/o RMC Equities, LLC, 26 Court Street, Suite 2304, Brooklyn, New York 11242 (the "Mortgagor") in favor of SIGNATURE BANK, a New York banking corporation, having an office at 68 South Service Road, Melville, New York 11747 (the "Mortgagee").

WITNESSETH, that the Mortgagor is indebted to the Mortgagee for the payment of an indebtedness in the sum of FIVE MILLION SEVEN HUNDRED SEVENTY FIVE THOUSAND AND 00/100 DOLLARS ($5,775,000.00) lawful money of the United States, to be paid, with interest thereon (as such sum may be reduced from time to time, together with the interest thereon, hereinafter sometimes collectively referred to and described as the "Debt"), according to a certain amended, consolidated and restated mortgage note or obligation bearing even date herewith (which, as now exists, and as the same may hereafter, from time to time be extended, amended, modified, restated or superseded, hereinafter collectively referred to as the "Note").

NOW THIS INDENTURE WITNESSETH that for better securing the payment of the Debt, and the performance by the Mortgagor of the terms, covenants, conditions and obligations contained herein, in the Note and in any other documents and agreements given to secure payment of the Note according to the true intent and meaning thereof, and also for and in consideration of one dollar ($1.00) to the Mortgagor in hand paid by the Mortgagee at or before the sealing and delivery of these presents, the receipt whereof is hereby acknowledged, the Mortgagor has mortgaged, granted, bargained, sold, aliened, released, conveyed and confirmed, and by these presents does mortgage, grant, bargain, sell, alien, release, convey and confirm unto the Mortgagee, forever, and grants the Mortgagee a security interest in:

9

## MORTGAGED PROPERTY

A.      All the land located in the County, City and State of New York described in Schedule A annexed hereto and made a part hereof and known by the street address of 264 West 115th Street, 276 West 115th Street, 278 West 115th Street, 2124 Frederick Douglass Boulevard a/k/a 2124 8th Avenue, 2120 Frederick Douglass Boulevard a/k/a 2120B Frederick Douglass Boulevard a/k/a 2120 8th Avenue a/k/a 2120B 8th Avenue and 2122 Frederick Douglass Boulevard a/k/a 2122 8th Avenue, New York, New York (the "Land");

B.      All buildings, structures and improvements of every nature whatsoever now or hereafter situated on the Land (the "Improvements");

TOGETHER with all and singular rights, hereditaments, and appurtenances belonging or in any way incident or appertaining thereto, including, but not limited to:

C.      All fixtures, machinery, appliances, materials, equipment, furniture and personal property of every nature whatsoever now or hereafter owned by the Mortgagor and located in or on, or attached to, or used, or intended to be used, in connection with the operation of, or with construction on, the Land or the Improvements, including all extensions, additions, improvements, betterments, renewals and replacements to any of the foregoing and all of the right, title and interest of the Mortgagor in and to any such personal property or fixtures together with the benefit of any deposits or payments now or hereafter made by the Mortgagor or on its behalf with regard thereto (the "Personal Property");

D.      All right, title and interest of the Mortgagor, if any, in and to the land in the bed of the streets or highways abutting the Land to the center line thereof; all easements, rights of way, strips and gores of land, streets, ways, sidewalks, curbs, alleys, passages, sewer rights, waters, water courses, water rights and powers, and all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments, remainders, reversions and appurtenances whatsoever, in any way belonging, relating or appertaining to the Land or the Improvements, or which hereafter shall in any way belong, relate or be appurtenant thereto, whether now owned or hereafter acquired by the Mortgagor (the "Appurtenances");

E.      All leases, lettings, occupancy agreements and licenses (collectively, the "Leases") of the Land and/or the Improvements or any part thereof now or hereafter entered into and all right, title and interest of the Mortgagor thereunder (including, without limitation, the cash and securities deposited thereunder), the right to receive and collect the rents, issues and profits from the Leases (the "Rents") and all the estate, right, title, interest, property, possession, claim and demand whatsoever, at law as well as in equity, of the Mortgagor of, in and to, and all proceeds of any sales or other dispositions of, the property described in Paragraphs (A), (B), (C) and (D) above and this Paragraph (E);

F.      All proceeds of and any unearned premiums on any insurance policies covering the Improvements or the Personal Property or the Rents including, without limitation, the right to receive and apply the proceeds of any insurance, judgments or settlements made in lieu thereof;

G.      All awards ("Awards"), heretofore made and hereafter to be made by any municipal, state or federal authorities to the Mortgagor and all subsequent owners of the property described above in Paragraphs (A) through (E) including any awards for any changes of grade of

10

streets affecting the property described above in Paragraphs (A) through (E) as the result of the exercise of the power of eminent domain (a "Taking");

H. All plans, drawings, specifications, site plans, subdivision maps, sketches, samples, contracts and agreements, however characterized from time to time prepared for use in connection with the development of the Land and the construction of the Improvements;

I. All contracts, agreements and understandings now or hereafter entered into, relating to or involving the performance of any work, rendering of any services, and supply of any materials or the conduct of operations in and the management of the Mortgaged Property including, without limitation, construction contracts, architect agreements, management agreements, options and other agreements, however characterized, affecting the Land and/or the Improvements or the public improvements required to be installed under the terms of governmental approvals relating to the Land or the subdivision in which the Land is a part;

J. Any and all permits, certificates, approvals and authorizations, however characterized, issued or in any way furnished whether necessary or not, for the operation and use of the Land and/or the Improvements and/or any other portion of the Mortgaged Property including, without limitation, certificates of occupancy, building permits, environmental certificates, certificates of operation, warranties and guarantees;

K. All cash funds, deposit accounts and other rights and evidence of rights to cash, now or hereafter created or held by Mortgagee pursuant to this Mortgage or any other of the Loan Documents (as hereinafter defined); and

L. All the other estate, right, title, interest, use, possession, property, claim and demand whatsoever, contract rights, general intangibles, actions and rights in action, relating to the property described above in Paragraphs (A) through (K) and proceeds, products, replacements, additions, substitutions, renewals and accessions of any of the foregoing.

All the property, interests and rights referred to in Paragraphs (A) through (L) above and any additional property, interests or rights hereafter acquired by the Mortgagor and subject to the lien of this Mortgage or intended to be so are referred to in this Mortgage as the "Mortgaged Property".

TO HAVE AND TO HOLD the Mortgaged Property to the Mortgagee, its successors and assigns, forever.

The Mortgagor hereby grants to the Mortgagee a security interest in all rights and property described above in Paragraphs (C) and Paragraphs (E) through Paragraph (L) (collectively, the "Collateral"). This Agreement shall constitute a self-operative Security Agreement under Article 9 of the Uniform Commercial Code with respect to such rights and property, but the Mortgagor agrees to execute and deliver on demand such other instruments as the Mortgagee may request in order to create or perfect its security interest or to impose the lien hereof more specifically upon any of such rights and property. The Mortgagee shall have all the rights and remedies under this Mortgage, or under any applicable law or agreements with the Mortgagor, of a Secured Party under the Uniform Commercial Code in addition to those specified herein.

11

This Mortgage shall also serve as a financing statement as provided for in Section 9-502(c) of the Uniform Commercial Code.

ARTICLE I

TERMS, COVENANTS, CONDITIONS,
REPRESENTATIONS AND WARRANTIES

The Mortgagor covenants, represents and warrants to the Mortgagee as follows:

**Section 1.1.** <u>Payment of Debt</u>. The Mortgagor will pay the Debt as provided in the Note.

**Section 1.2.** <u>Maintenance of the Mortgaged Property and Compliance with Laws</u>. The Mortgagor, shall (at its expense in so far as is applicable by the context):

(a)    maintain the Improvements in good and substantial order and repair and in such fashion that the value and utility of the Mortgaged Property will not be diminished and will make or cause to be made all necessary and appropriate repairs, replacements, and renewals thereof, whether interior or exterior, structural or non-structural; all repairs, replacements and renewals to be at least equal, in quality and class, to that of the original Improvements;

(b)    not use or cause the whole or any part of the Mortgaged Property to be used in such a manner as to cause the same to be subject to forfeiture under applicable laws. In the event that any person or entity, in possession of the whole or any part of the Mortgaged Property, or otherwise, may, by acts or omissions, cause the Mortgaged Property to be subject to forfeiture, the Mortgagor, within five (5) days after receiving notice of the occurrence of any such act or omission, shall notify the Mortgagee of the occurrence of such act or omission and shall commence such legal proceedings against the party committing or permitting the acts or omissions as shall be necessary to prevent such forfeiture;

(c)    comply with, or cause to be complied with, all laws, statutes, codes, acts, ordinances, orders, judgments, decrees, injunctions, rules, regulations, permits, licenses, authorization, directions and requirements of all governments, departments, commissions, boards, courts, authorities, agencies, officials and officers which may, as at the date of this Mortgage or thereafter, affect the Mortgaged Property or any part thereof or its use or condition, or which may affect any adjoining sidewalks, curbs, vaults and vault space if any, or streets or ways in so far as the Mortgagor is required to comply therewith;

(d)    comply with, or cause to be complied with, all requirements of the issuer of any policy(s) of insurance covering or affecting the whole or any part of the Mortgaged Property, and all orders, rules, regulations and other requirements of the New York Board of Fire Underwriters (or that of any other body exercising similar functions) applicable to the Mortgaged Property or any part thereof; and

(e)    not do or permit any act or thing which is contrary to the requirements or prohibitions of any document of record affecting the Mortgaged Property nor commit or permit any waste of or any nuisance in, at or on the Mortgaged Property or any part thereof.

**Section 1.3.** <u>Alterations</u>. None of the Improvements or any part or portion thereof, and

12

none of the Personal Property or any part or portion thereof, shall be removed, altered or demolished without the prior written consent of the Mortgagee in each instance, provided, however, that the Mortgagor shall have the right, without the consent of the Mortgagee, to remove and dispose of, free from the lien of this Mortgage, such Personal Property as from time to time may become worn out or obsolete, provided that, simultaneously with or prior to such removal, any such Personal Property shall be replaced with Personal Property of like kind and value at least equal to that of the replaced Personal Property and free from any title retention, security interest or other encumbrance.

Section 1.4. Taxes and Other Charges; Mortgage Taxes. (a) The Mortgagor will pay when due (i) all liens of any kind, taxes of any kind and nature (including but not limited to real and personal property taxes and income, franchise, withholding, profits and gross receipts taxes), assessments, water and sewer charges, rents and rates, and other governmental or municipal charges, fines or impositions relating to the Mortgaged Property or any part thereof, and (ii) taxes upon the rents, revenues, income or profits of the Mortgaged Property, or taxes arising in respect of the occupancy, use or possession of the whole or any part thereof, which, if not paid, shall result in the imposition of a lien upon the Mortgaged Property, and the Mortgagor will promptly deliver official receipts therefor to the Mortgagee.

(b)    The Mortgagor will not claim any deduction from the taxable value of the Mortgaged Property by reason of this Mortgage nor shall the Mortgagor claim or be entitled to any credit against the principal and interest due and owing under the Note and this Mortgage for any taxes, assessments, water rates or other governmental or municipal charges, bonds or impositions paid by the Mortgagor relating to the Mortgaged Property.

(c)    In the event of the passage after the date of this Mortgage of any law of the state wherein the Mortgaged Property is located deducting from the value of land for the purposes of taxation any lien thereon, or changing in any way the laws for the taxation of mortgages or debts secured by mortgages for state or local purposes, or the manner of the collection of any such taxes so as to affect this Mortgage, or the Debt, the Mortgagee shall have the right to give thirty (30) days written notice to the owner of the Mortgaged Property requiring the payment of the Debt, and if such notice be given, the Debt shall become due, payable and collectible at the expiration of said thirty (30) days. Unless prohibited by applicable law, any notice given pursuant to this Subsection requiring the payment of the Debt shall provide an option to the Mortgagor, in lieu of such acceleration, to either pay to the Mortgagee an amount or amounts equal to any and all sums payable by the Mortgagee as taxes or otherwise by reason of such laws including taxes, if any, payable on the amounts so paid to the Mortgagee or, in the alternative, pay the Debt in full. If the notice as provided above be given, the payment of said sums described in the preceding sentence or the Debt, as may be the case, shall become due, payable and collectible at the expiration of the thirty (30) day period referred to above.

(d)    If at any time the United States of America, any state thereof or any governmental subdivision of any such state, shall require (i) revenue or other stamps to be affixed to the Note or this Mortgage, or (ii) the payment of any taxes or fees on this Mortgage, or the Note or in connection with the recording of this Mortgage or any amendment, extension or modification hereof, the Mortgagor will pay the same, with interest and penalties thereon, if any.

Section 1.5. Tax Deposits. The Mortgagee shall require that the Mortgagor deposit with the Mortgagee, monthly, one-twelfth (1/12th) of the annual charges for real estate taxes and, if applicable, frontage, and, if required by the Mortgagee, assessments, and other charges which

13

might become a lien upon the Mortgaged Property (or any part thereof) and the Mortgagor shall, accordingly, make such deposits. In addition, the Mortgagor shall simultaneously therewith deposit with the Mortgagee a sum of money which, together with the monthly installments aforementioned, will be sufficient to make each of the payments aforementioned at least thirty (30) days prior to the date on which such payments are due. Should said charges not be ascertainable at the time any deposit is required to be made with the Mortgagee, the deposit shall be made on the basis of an estimate made by the Mortgagee in its sole discretion, and when the charges are fixed for the then current year, the Mortgagor shall deposit any deficiency with the Mortgagee. All funds so deposited with the Mortgagee shall be held by it, but not in escrow and, except to the extent required by applicable law, without interest, and, provided that no "Event of Default" (as defined below in Section 2.1.1), shall have occurred and be continuing, shall be applied in payment of the charges aforementioned when and as payable, to the extent the Mortgagee shall have such funds on hand. Should an Event of Default occur and be continuing, the funds deposited with the Mortgagee, as aforementioned, may be applied in payment of the charges for which such funds shall have been deposited or to the payment of the Debt or any other charges affecting the security of the Mortgagee, as the Mortgagee sees fit, but no such application shall be deemed to have been made by operation of law or otherwise until actually made by the Mortgagee as herein provided, nor shall any application be deemed to affect any right or remedy of the Mortgagee hereunder or under any statute or rule of law. If deposits are being made with the Mortgagee, the Mortgagor shall furnish the Mortgagee with bills for the charges for which such deposits are required to be made hereunder and/or such other documents necessary for the payment of same, at least fifteen (15) days prior to the date on which the charges first become payable.

Section 1.6. Warranty of Title. The Mortgagor represents and warrants that it is the fee simple owner of the Mortgaged Property free of defects, liens, and encumbrances of any nature other than those exceptions to title as set forth in the Mortgagee's title insurance policy or the marked title insurance commitment delivered to the Mortgagee as of the date hereof and insuring the lien of this Mortgage. The Mortgagor warrants that this Mortgage is and will be maintained as a valid first lien on the Mortgaged Property subject only to the above-mentioned exceptions, and will defend the same against the claims of all persons or entities whomsoever. At the Mortgagor's sole cost and expense, the Mortgagor forthwith upon the execution and delivery of this Mortgage, and thereafter from time to time, will cause this Mortgage, and any security instrument creating or evidencing the lien or security interest hereof upon the Mortgaged Property and each instrument of further assurance, to be filed, registered or recorded in such manner and in such places as may be required by any present or future law to publish notice of and fully to protect the lien hereof upon, and the lien of the Mortgagee in, the Mortgaged Property.

Section 1.7. Right of Mortgagee to Defend and Uphold the Lien; Costs. (a) The Mortgagee shall have the right to appear in and defend any action or proceeding brought with respect to the Mortgaged Property and to bring any action or proceeding, in the name and on behalf of the Mortgagor, which the Mortgagee, in its sole discretion, believes should be brought to protect its interest in or the title to the Mortgaged Property. The Mortgagee may take such action by attorneys selected by the Mortgagee.

(b)    If any action or proceeding be commenced, whether adversary or not (including an action to foreclose this Mortgage or to collect the Debt), to which action or proceeding the Mortgagee is made a party, or in which it becomes necessary to defend, uphold or enforce the lien of this Mortgage, the Mortgagee may prosecute, defend or participate in such

14

action or proceeding by attorneys selected by the Mortgagee.

(c) All sums paid by the Mortgagee for the expense of any such action or proceeding described in this Section including any appellate proceeding in connection herewith (including without limitation, reasonable attorneys' fees and disbursements at trial and appellate level) shall be paid by the Mortgagor to the Mortgagee, upon demand, together with interest from the date that such sum is advanced, payment made or expense incurred, to and including the date of reimbursement, computed at the default rate provided in the Note (the "Default Rate"). Any such sum paid by the Mortgagee and the interest thereon shall be a lien on the Mortgaged Property prior to any claim, lien, right, title or interest in, to or on the Mortgaged Property attaching or accruing subsequent to the lien of this Mortgage, and shall be deemed to be secured by this Mortgage and evidenced by the Note.

(d) In the event the maturity of the principal amount of the Debt shall be accelerated by reason of a default under the Note, this Mortgage or any other instrument given to secure the payments provided to be made pursuant to the Note, in addition to the costs and fees described above in Subsection (c), the Mortgagor shall pay to the Mortgagee, upon demand, together with the interest thereon at the Default Rate, the fees and costs incurred by the Mortgagee, following such acceleration, in obtaining an appraisal of the fair market value of the Mortgaged Property prepared by an appraiser, duly qualified under applicable law and governmental regulations to issue appraisals of real property to the Mortgagor in connection with the approval of loans so secured, and the fees and costs incurred by the Mortgagor in obtaining an Environmental Survey of the Mortgaged Property, as defined below in Subsection 1.24 (f). Upon reasonable notice to the Mortgagor, the Mortgagee, its officers, employees, agents and contractors, may enter the Mortgaged Property to conduct the Environmental Survey. Any such fees and costs paid by the Mortgagee and the interest thereon shall be a lien on the Mortgaged Property prior to any claim, lien, right, title or interest in, to or on the Mortgaged Property attaching or accruing subsequent to the lien of this Mortgage, and shall be deemed to be secured by this Mortgage and evidenced by the Note.

Section 1.8. Insurance Coverage. (a) The Mortgagor, until the Debt secured by this Mortgage shall be fully paid and satisfied, shall keep, as applicable, the Mortgagor, the Improvements and the Personal Property insured, by a company or companies and in form, amounts and with coverage and deductibles satisfactory to Mortgagee against:

(i) loss or damage by perils customarily included under standard "all risk" policies, and all other contingencies as may be required by the Mortgagee, which shall evidence, by endorsement, (i.e., a so-called "agreed amount" replacement cost endorsement insuring one hundred percent (100%) of the replacement cost of the Improvements) the agreement of the insurer to pay, upon the occurrence of an insured loss, a sum equal to the cost to repair or replace the lost or damaged Improvements and the Personal Property which shall be damaged or destroyed by reason of an insured loss, with property of a like kind and quality, without deduction for depreciation and normal wear and tear;

(ii) the coverages provided by so called Commercial General Liability insurance, applicable to the Mortgaged Property, in such amounts as are usually carried by persons or entities owning properties similar to the Mortgaged Property wherein is being conducted the business then being conducted therein in the same general locality as that of the Mortgaged Property, but in any event for amounts not less than $1,000,000.00 for each occurrence, for death, personal injury and property damage, and $5,000,000.00, in the aggregate

15

for covered occurrences, which amounts shall be increased, from time to time, to reflect what a reasonably prudent owner or lessee of buildings or improvements similar in type and locality to that of the Mortgaged Property would carry;

(iii)   the coverages provided by explosion insurance in respect of any steam and pressure boilers and similar apparatus, if any, in the Mortgaged Property in such amounts as are usually carried by persons or entities operating similar properties in the same general locality to that of the Mortgaged Property but in any event in an amount no less than $1,000,000.00;

(iv)   the coverages provided by business interruption insurance in an amount equal to one (1) year's loss of gross earnings, rental value and the extra expense that could result from the cessation of the business conducted by the Mortgagor at the Mortgaged Property or rent insurance against one (1) year's loss of gross rental income (whichever of the two types of insurance is applicable) arising out of damage or destruction by reason of the risks described above in Subsections (i) and (iii).  All proceeds of such insurance in the event of loss recovery thereunder shall be paid to the Mortgagee and shall be held and applied by the Mortgagee to the extent of such loss recovery toward the payment of principal and/or interest due under the Note, real estate taxes and insurance premiums and any and all sums and obligations secured by this Mortgage, as they become due under the Note or this Mortgage, or for such other purposes as the Mortgagee shall in its discretion determine.  No amounts so held shall be deemed to be trust funds, but may, at the option of the Mortgagee, be commingled with general funds of the Mortgagee and no interest shall be payable thereon.  If, pursuant to any provision of the Note and of this Mortgage, the entire amount of the principal amount of the Debt becomes due and payable, the Mortgagee shall have the right, at its election, to apply any amounts paid to the Mortgagee under this Subsection against the Debt;

(v)   the coverages provided by all-risk builders' risk insurance with respect to the Mortgaged Property during any period in which there is any construction occurring with respect to the Improvements, in an amount no less than the full replacement cost of the Improvements which are the subject of the construction;

(vi)   if the Mortgaged Property is now located in an area having special flood hazards or if such area hereafter shall be designated by the United States Government, or any agency thereof, as having special flood hazards, the coverages provided by a policy insuring against floods in an amount equal to the lesser of (A) the principal amount secured by this Mortgage or (B) the maximum amount available pursuant to federal law;

(vii)   insurance against such other hazards (including war damage insurance, if and when the same is available from the United States Government or any agency or subdivision thereof) as may be reasonably required by the Mortgagee from time to time and as are customarily insured against with respect to like properties; and

(viii)   in addition, shall keep and maintain worker's compensation insurance to the full extent required by applicable law for all employees of the Mortgagor engaged in any work on or about the Mortgaged Property.

(b)   All companies which shall provide the insurance required by this Mortgage shall have a rating of A-8 or better, in the edition of Bests Key Rating Guide current for the time when the insurance is given, and shall be qualified to do business in the State where

16

the Mortgaged Property is located.

(c)     At the time of the execution of this Mortgage and at least thirty (30) days prior to the expiration of each policy required to be provided by the Mortgagor pursuant to the provisions of this Section, the Mortgagor shall deliver to the Mortgagee the policy or policies or renewal policy or policies, as the case may be, with appropriate evidence of the payment of the premium therefor.

(d)     The insurance policies required to be procured pursuant to this Mortgage shall:

(i)     as to the insurance coverage required under subsection (a) (i), (iii) and (iv) above, contain a standard New York non-contributory form of mortgagee endorsement satisfactory to the Mortgagee, naming the Mortgagee, its successors and assigns as their interests may appear, as "mortgagee insured", and as "loss payee", and providing that no act, omission or negligence of the Mortgagor, or its agents, servants or employees, or of any tenant under any lease for the whole or any part of the Mortgaged Property, which might otherwise result in a forfeiture of such insurance or any part thereof, shall in any way affect the validity or enforceability of such insurance insofar as the Mortgagee is concerned;

(ii)     as to all other coverage name the Mortgagor and the Mortgagee, as named insureds, as their respective interests may appear; and

(iii)     provide, to the extent obtainable, that such policies may not be canceled or amended or in any way limited in coverage or reduced in amount without at least thirty (30) days' prior written notice to the Mortgagee, that no claims thereunder shall be paid without at least ten (10) days prior written notice to the Mortgagee and that the insurance proceeds or awards may be adjusted only after obtaining the prior written consent of the Mortgagee.

(e)     The Mortgagor, at its expense, will furnish to the Mortgagee, within ninety (90) days after demand (but not more frequently than once in each consecutive period of sixty (60) calendar months) proof of the then full insurable value of the Improvements and the Personal Property, such proof to be by appraisals satisfactory in form and substance to the Mortgagee and prepared by an appraiser designated and paid for by the Mortgagor and approved by the Mortgagee. No failure or omission on the part of the Mortgagee to request any such appraisals or proof shall relieve the Mortgagor of any of its obligations under this Section.

(f)     In the event that any one or more of the properties comprising any of the Improvements or the Personal Property shall be damaged or destroyed, in whole or in part, by fire or other casualty, the Mortgagor shall promptly restore, replace, rebuild or alter the damaged or destroyed Improvements and Personal Property, in either case as nearly as possible to the condition the Improvements and Personal Property were in prior to such damage or destruction, without regard to the availability or adequacy of insurance proceeds but only if Mortgagee shall make the insurance proceeds obtained by it available to Mortgagor to pay for such work. If the damage of such nature as to require the Mortgagor to construct a replacement for, or to alter the damaged or destroyed items in any material or substantial way, the Mortgagor shall, before commencing any such work, submit to the Mortgagee for the Mortgagee's approval, which shall not be unreasonably withheld or delayed, copies of the plans and specifications therefor to be prepared by an architect or engineer selected by the Mortgagor, subject to the approval of the

17

Mortgagee, who shall then be licensed by the state in which the Mortgaged Property is located, and who shall have been placed in charge of the restoration of the Improvements.

(g)     Until the full payment of the Debt, the Mortgagee shall have and hold the insurance policies described in this Section as collateral and further security for the payment of the Debt.  In default of the Mortgagor's compliance with this Section, (i) the Mortgagor hereby agrees to indemnify and hold the Mortgagee harmless against all damage, loss or liability resulting from all risks that would have been covered by such insurance to the extent of the benefit which would have been received by the Mortgagee had the insurance coverage required to be obtained under this Subsection been obtained and maintained by the Mortgagor as required hereunder and (ii) the Mortgagee or its successors or assigns may, but shall have no obligation to, place such insurance as described above, from time to time, in an amount in the aggregate not exceeding the amount of insurance required to be obtained under this Section, for the purpose aforesaid, and pay the premium or premiums therefor.  In the event of such payment, the Mortgagor will pay to the Mortgagee, its successors or assigns such premium or premiums so paid by the Mortgagee, upon demand, together with interest from the date that such sum is advanced, payment made or expense incurred, to and including the date of reimbursement, computed at the Default Rate.  Any such sum paid by the Mortgagee and the interest thereon shall be a lien on the Mortgaged Property prior to any claim, lien, title or interest in, to or on or claim upon the Mortgaged Property attaching or accruing subsequent to the lien of this Mortgage and shall be deemed to be secured by this Mortgage and evidenced by the Note.  In addition, in the event of a default of such payment by the Mortgagor or of the delivery of policies as provided above in this Section, the Debt shall, at the option of the Mortgagee, its successors or assigns, immediately become due and payable.

(h)     The insurance required pursuant to this Section may be effected by a policy of blanket insurance which may cover property in addition to the Mortgaged Property, provided that the coverage shall be the same as if the Mortgaged Property were the sole property insured and the Mortgagor shall deliver to the Mortgagee a duplicate original copy or copies thereof or original insurance certificates therefor.

Section 1.9.  Insurance Proceeds.  (a) The Mortgagor shall give the Mortgagee prompt notice of any damage or destruction by fire or casualty occurring at the Mortgaged Property and the Mortgagor shall make such temporary repairs as are necessary for the protection of the Improvements.  The proceeds of any insurance paid on account of any damage or destruction to the Mortgaged Property shall be paid over to the Mortgagee to be applied as hereinafter provided.  In the event any such insurance proceeds shall be paid to the Mortgagor or by two-party check delivered to the Mortgagor, the Mortgagor shall forthwith pay such insurance proceeds to the Mortgagee, or endorse such two-party check and deliver it to Mortgagee (as the case may be), and the Mortgagor shall be personally liable for any such insurance proceeds not paid to the Mortgagee, notwithstanding any exculpation provision contained in this Mortgage or in any other Loan Document (as defined in Section 2.1.1(h) of this Mortgage).

(b) The Mortgagee shall have the option, in its sole discretion, to apply any insurance proceeds it may receive by reason of damage or destruction to the Mortgaged Property toward payment of the Debt, or the same may be paid over either wholly or in part to the Mortgagor or to the heirs, successors or assigns of the Mortgagor for the repair of the Improvements and Personal Property or for the erection of new Improvements and the acquisition and installation of new Personal Property in their place, or for any other purpose or object satisfactory to the Mortgagee, and, if the Mortgagee shall receive and retain insurance

18

money for such damage to the Mortgaged Property, the lien of this Mortgage shall be affected only by a reduction of the amount of said lien by the amount of such insurance money received and retained by the Mortgagee and applied toward payment of the obligations secured hereby.

(c) Notwithstanding anything to the contrary contained herein, if the Mortgaged Property is damaged by fire or other casualty, the Mortgagee will make seventy-five percent (75%) of the net insurance proceeds available for restoration, provided that: (i) the net insurance proceeds are sufficient, in the opinion of the Mortgagee, to fully repair such damage to the Mortgaged Property or, if such proceeds are insufficient to fully repair the damage to the Mortgaged Property, the Mortgagor shall have deposited with the Mortgagee cash in an amount equal to the difference between the cost of repairing the damage to the Mortgaged Property and the amount of the net insurance proceeds; (ii) the Mortgagor is not then in default under the terms of this Mortgage beyond any applicable notice and cure periods and (iii) in its opinion the restoration can be completed within twelve (12) months from the occurrence of the damage. The remaining twenty-five percent (25%) of the net insurance proceeds shall be released after completion of the restoration and the rental of the restored portion of the Mortgaged Property at a rental acceptable to the Mortgagee. If the restoration is undertaken, the Mortgagor shall submit plans and specifications and a budget, subject to the Mortgagee's approval, not to be unreasonably withheld, conditioned or delayed. Disbursement of the insurance proceeds will be made periodically pursuant thereto. The expenses incurred by the Mortgagor (including, without limitation, hard and soft costs) will be paid by the Mortgagor to the extent that the insurance proceeds available to the Mortgagee are insufficient to pay such expenses. The Mortgagee shall not be required at any time to disburse any proceeds if the undisbursed balance thereof is, in its sole opinion, insufficient to timely complete the restoration free of liens in accordance with the plans and specifications.

Section 1.10. Condemnation. (a) The Mortgagor shall give the Mortgagee prompt notice of any condemnation or eminent domain proceedings affecting the Mortgaged Property.

(b) The Mortgagor will not enter into any agreement for a Taking of the Mortgaged Property, or any part thereof, without the prior written consent of the Mortgagee.

(c) In the event the whole or any part of the Mortgaged Property shall be the subject of a Taking, or shall be voluntarily conveyed in lieu thereof prior to the payment in full of the Debt, the Mortgagor shall pay to the Mortgagee, during the period from the date of a Taking (or conveyance in lieu thereof) to the payment in full of the Debt, the difference, if any, between the interest payable thereon at the rate stipulated in the Note in respect of the Debt and the interest actually paid to the Mortgagor by the entity exercising the right of eminent domain or to whom the Mortgaged Property was conveyed in lieu of the exercise of such power.

(d) All Awards are hereby assigned to the Mortgagee. The Mortgagee and its legal representatives, successors and assigns (at its or their option) are hereby irrevocably authorized and empowered to collect and receive the Awards from the authorities making the same, to give proper receipts and acquittances therefor in any of their names or in the name of the Mortgagor, and to apply the same toward the payment of the Debt, the Note or this Mortgage, in such priority and proportions as the Mortgagee in its discretion shall deem proper, although the Debt secured by this Mortgage then may not be due and payable. If the Mortgaged Property is sold, through foreclosure or otherwise, prior to the receipt by the Mortgagee of any Awards, the Mortgagee shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive any Awards, or a portion thereof sufficient to pay

19

the Debt, whichever is less.

(e)    Notwithstanding any Taking, the Mortgagor shall continue to pay the Debt at the time and in the manner provided for in the Note and in this Mortgage and the Debt shall not be reduced until any Awards shall have been actually received and applied by the Mortgagee to the discharge of the Debt.  The Mortgagor shall file and prosecute its claim or claims for any Awards in good faith and with due diligence and cause the same to be collected and paid over to the Mortgagee.  The Mortgagor, further, hereby irrevocably appoints the Mortgagee and its officers and employees the attorney-in-fact of the Mortgagor, coupled with an interest, to file, prosecute, settle, and compromise its claims for any Awards, to receive any Awards and to endorse any instruments with respect thereto.  The Mortgagor further agrees that although it is hereby expressly agreed that the same shall not be necessary in any event, the Mortgagor shall, upon demand, of the Mortgagee, make, execute and deliver to it any and all assignments and other instruments sufficient for the purpose of assigning any Awards to the Mortgagee, free, clear and discharged of any encumbrances of any kind or nature whatsoever.

Section 1.11.  Estoppel Certificates.  (a)    The Mortgagor, within twenty (20) days of the receipt of a request from the Mortgagee, but not more frequently than twice in any twelve (12) month period, will furnish a written statement, duly acknowledged, of the amount due on the Debt and whether any offsets and defenses exist against the Debt.

(b)    The Mortgagee, within twenty (20) days of the receipt of a request from the Mortgagor, but not more frequently than twice in any twelve (12) month period, will furnish to the Mortgagor a statement setting forth the principal balance then outstanding on the Note, accrued interest thereon to the date of the statement and the date to which such interest has been paid.

Section 1.12.  Financial Statements.  (a) The Mortgagor agrees to furnish the Mortgagee, the financial statements required pursuant to the provisions of the Note.

(b)    Promptly after a request therefor, the Mortgagor shall furnish to the Mortgagee such other financial data or information as the Mortgagee may reasonably request from time to time.

(c)    At the same time as it delivers the financial statements required under the provisions of Subsections (a) and (b) above, the Mortgagor shall furnish to the Mortgagee a certificate signed by the Mortgagor, to the effect that no default under the Note, an Event of Default under this Mortgage nor a default in or under any other agreement to which the Mortgagor is a party or by which it is bound, or by which any of its properties or assets may be affected, and no event which, with the giving of notice or the lapse of time, or both, would severally constitute such an event of default, has occurred, and specifying in reasonable detail, the exceptions, if any, to such statement.

(d)    The Mortgagee shall have the right to inspect the books and records of the Mortgagor at reasonable times.

Section 1.13.  Restrictions on Sales and Transfers.  The Mortgagor shall not, without the consent in writing of the Mortgagee, voluntarily change the use of the Mortgaged Property or sell, transfer, or convey its interest in the Mortgaged Property or any part thereof in or by any one or series of transactions or permit the Mortgaged Property or any part thereof or any interest therein to be sold, transferred, or conveyed.  For the purposes of this Section a "sale" shall

20

include: (I) if the Mortgagor is a corporation, any of its voting shares of stock shall be, directly or indirectly, sold, transferred or pledged, or any interest therein shall be transferred by the issuance of new shares or otherwise, in any one or series of transactions; or, (II) if the Mortgagor is a partnership, limited liability company, joint venture or similar entity, any interest or interests in the Mortgagor, directly or indirectly, be sold, transferred or pledged or any of the interests therein be transferred or diluted by the admission of new partners, members or otherwise, in any one or series of transactions; or, if by operation of law, either the Mortgaged Property or such voting shares or interests shall be sold, transferred or pledged, in any one or series of transactions. Consent to one such transaction shall not be deemed to be a waiver of the right to require such consent to further or successive transactions. Notwithstanding the foregoing, transfers of interests to or among the members of the Mortgagor or their immediately family members (or trusts or other entities created for their benefit) shall be permitted without the prior consent of the Mortgagee provided at all times management of the Mortgagor remains, directly or indirectly, with the Guarantor (as such term is defined in the Note). In addition, transfers of not more than forty nine percent (49%) of the ownership interests in the Mortgagor shall be permitted provided at all times either Stanley Reifer or Daniel Reifer maintains control over the management of the Mortgagor.

Section 1.14. Restrictions on Leasing and Further Encumbrances. The Mortgagor shall not, without first obtaining the prior consent of the Mortgagee in each such instance:

(a) mortgage, convey or grant a lien subordinate to this Mortgage on the Mortgaged Property, or on any or all of the Land, Improvements, Personal Property or Appurtenances of which it is comprised;

(b) collect any Rents for a period of more than one (1) month in advance other than the security deposited in connection with a Lease;

(c) further pledge, transfer, mortgage or otherwise encumber or assign the Leases and Rents;

(d) except with respect to residential Leases in Mortgagor's ordinary course of business and using reasonable business judgment waive, excuse, condone, discount, set-off, compromise, cancel, terminate or in any manner release or discharge, any tenant under any Lease, of and from any obligations, covenants and agreements by said tenant to be kept, observed and performed, including the obligation to pay rent thereunder, in the manner and at the place and time specified therein (reference is made to Section 291-f of the Real Property Law of the State of New York to establish for the Mortgagee the rights and benefits provided therein);

(e) except with respect to residential Leases in Mortgagor's ordinary course of business and using reasonable business judgment cancel, terminate or consent to any surrender of any Lease, except as may be provided in any such Lease, or commence an action of ejectment or any summary proceedings for dispossession of the tenant under any Lease or execute any right to recapture provided in any Lease;

(f) except with respect to residential Leases in Mortgagor's ordinary course of business and using reasonable business judgment execute or permit to exist any Lease except for occupancy by the lessee under and pursuant to a written lease in form and substance satisfactory to the Mortgagee and with a lessee satisfactory to Mortgagee;

21

(g)     except with respect to residential Leases in Mortgagor's ordinary course of business and using reasonable business judgment modify, amend, extend or renew any Lease, or permit the lessee under any Lease to assign the tenancy thereunder unless such lessee has such right of assignment under its lease without the necessity of obtaining Mortgagor's consent thereto (reference is made to Section 291-f of the Real Property Law of the State of New York to establish for the Mortgagee the rights and benefits provided therein);

(h)     except with respect to residential Leases in Mortgagor's ordinary course of business and using reasonable business judgment relocate any tenant under any Lease, nor consent to any modification of the express purposes for which such space has been leased, nor consent to any subletting of all or any portion of the Mortgaged Property, or to an assignment of any Lease or a further subletting of any sublease, except as may be provided in any Lease;

(i)     consent or agree to accept a subordination of any Lease to any mortgage or other encumbrance (other than this Mortgage) now or hereafter affecting the Mortgaged Property; or

(j)     create or permit to exist any easement or restrictive covenant affecting the Mortgaged Property.

Consent to one such transaction shall not be deemed to be a waiver of the right to require such consent to future or successive transactions.

Section 1.15.  Liens.  The Mortgagor shall discharge of record, by the filing of a bond pursuant to court order or otherwise, any mechanic's or materialmen's lien or a judgment lien filed against the Mortgaged Property, within thirty (30) days after the filing thereof.

Section 1.16.  No Recorded Restrictions Based on Race, Etc.  The Mortgagor shall not execute or file or record any instrument which imposes a restriction upon the sale or occupancy of the Mortgaged Property on the basis of race, sex, religion, national origin, color or creed. Upon any violation of this undertaking, the Mortgagee may, at its option, declare the unpaid balance of the Debt to be immediately due and payable.

Section 1.17.  Maintenance of Existence.  The Mortgagor will, if other than a natural person, do all things necessary to preserve and keep in full force and effect its existence, franchises, rights and privileges as a business or stock corporation, partnership, limited liability company, trust or other entity under the laws of the jurisdiction of its formation or incorporation and will comply with all regulations, rules, ordinances, laws, statutes, orders and decrees of any governmental authority applicable to it or to the Mortgaged Property, or any part thereof. If the Mortgagor herein is a corporation, then the Mortgagor represents that the execution of this Mortgage has been duly authorized by the Board of Directors of the Mortgagor and this Mortgage is made in the regular and ordinary course of business. If the Mortgagor herein is a partnership, limited liability company or joint venture, then the Mortgagor represents that, as may be the case, all of its general partners, members, and, to the extent required by law and its organizational documents, its limited partners, members, if any, have authorized the execution of this Mortgage and this Mortgage is made in the regular and ordinary course of business.

Section 1.18.  Usury.  Nothing herein or in the Note, and none of the terms, covenants, conditions or obligations hereof or thereof shall impose or shall be deemed to impose upon the Mortgagor an obligation to make any payment, pay any interest or late charges in excess of, or

22

do any act or take any action, or forbear from doing any act or taking any action, in violation of any statute, rule, ordinance or regulation in effect and effective as of the date of such payment, act, action or forbearance. In no event shall the Mortgagor be required to make any such illegal or impermissible payment or to take or do any such illegal or impermissible act or forbear from so doing or so taking nor shall any such failure so to pay or act or such forbearance be deemed a default hereunder. If the provisions of this Mortgage would at any time otherwise require payment by the Mortgagor to the Mortgagee of an amount of interest in excess of the maximum amount then permitted by law, the interest payments to the Mortgagee shall be reduced to the extent necessary so that the Mortgagee shall not receive interest in excess of such maximum amount. To the extent that, pursuant to the foregoing sentence, the Mortgagee shall receive interest payments hereunder in an amount less than the amount otherwise provided, such deficit (the "Interest Deficit") will accumulate and will be carried forward (without interest) until the Debt is paid in full. Interest otherwise payable to the Mortgagee hereunder for any subsequent period shall be increased by the maximum amount of the Interest Deficit that may be so added without causing the Mortgagee to receive interest in excess of the maximum amount then permitted by law. The terms, covenants, conditions and obligations hereof or of the Note requiring any such illegal or impermissible payment, act, action or forbearance on the part of the Mortgagor to be made or taken are deemed amended, modified or altered in such a manner as to bring all and each of them into conformity with the applicable statutes, rules, ordinances or regulations in respect of the Mortgagor and the Mortgagor hereby covenants and agrees to abide by, conform to and comply with any and all such terms, covenants, conditions and obligations as so amended, modified or altered.

### Section 1.19. Payment of Charges; Advances and Disbursements; Costs of Administration and Enforcement.

(a)     Upon default of the Mortgagor in the performance of any term, covenant, condition or obligation by the Mortgagor to be performed under the Note or this Mortgage, or to pay, when due, any of the sums which the Mortgagor is required to pay as provided above in Section 1.4, the Mortgagee may, but shall not be obligated to, cure such default, or make such payment in the name and on behalf of the Mortgagor. All sums advanced and all expenses incurred at any time by the Mortgagee pursuant to this Section 1.19 or as otherwise provided under the terms, covenants, conditions or obligations of this Mortgage or under applicable law shall be reimbursed by the Mortgagor to the Mortgagee, upon demand, and shall bear interest from the date that such sum is advanced, payment made or expense incurred, to and including the date of reimbursement, computed at the Default Rate. Any such sum paid by the Mortgagee and the interest thereon shall be a lien on the Mortgaged Property prior to any claim, lien, right, title or interest in, to or on the Mortgaged Property attaching or accruing subsequent to the lien of this Mortgage, and shall be deemed to be secured by this Mortgage and evidenced by the Note.

(b)     The Mortgagor shall bear and pay all direct and incidental expenses (including, without limitation, attorneys' fees and disbursements for legal services of every kind at trial and appellate level) relating to the administration of this Mortgage and the other Loan Documents (as defined in Section 2.1.1(h) of this Mortgage) including, without limitation, the performance of new appraisals of the Mortgaged Property necessitated by (i) the Mortgagee's credit policy guidelines applicable to mortgage loans made by Mortgagee or (ii) any regulatory requirements imposed upon Mortgagee by any governmental or quasi-governmental entity having jurisdiction over Mortgagee. All such expenses paid by the Mortgagee shall be reimbursed by the Mortgagor to the Mortgagee, upon demand, and shall bear interest from the date that such sum is advanced, payment made or expense incurred, to and including the date of

23

reimbursement, computed at the Default Rate. Any such sum paid by the Mortgagee and the interest thereon shall be a lien on the Mortgaged Property prior to any claim, lien, right, title or interest in, to or on the Mortgaged Property attaching or accruing subsequent to the lien of this Mortgage, and shall be deemed to be secured by this Mortgage and evidenced by the Note.

Section 1.20. Assignment of Leases and Agreements.

(a)    Except as set forth in Section 1.14 herein, pursuant to Section 291-f of the Real Property Law of the State of New York, neither the Mortgagor nor any tenant under any Lease shall have the right or power, as against the Mortgagee without its consent, to cancel, abridge or otherwise modify tenancies, subtenancies, leases or subleases now or hereafter in effect in respect of all or any part of the Mortgaged Property or the Improvements or to accept or make, as the case may be, prepayments of installments of rent to become due thereunder. The Rents of the Mortgaged Property are hereby transferred and assigned to the Mortgagee, and the Mortgagee shall have the right to enter upon the Mortgaged Property for the purpose of collecting the same and to let and operate the Mortgaged Property or any part thereof and to apply the Rents, either in whole or in part, as the Mortgagee elects, to the payment of all charges and expenses of the Mortgaged Property or in reduction of any part of the Debt or other sums due or to become due under the Note or this Mortgage. This assignment and grant shall continue in effect until the Debt and all other obligations secured by this Mortgage are paid in full. The Mortgagee hereby waives the right to enter upon the Mortgaged Property for the purpose of collecting the Rents and the Mortgagor shall have a license to collect and receive the Rents until an Event of Default hereunder, but such license of the Mortgagor may be revoked by the Mortgagee upon any such Event of Default. From and after the occurrence of an Event of Default hereunder all Rents collected or received by Mortgagor shall be accepted and held for Mortgagee in trust and shall not be commingled with the funds and property of Mortgagor, but shall be promptly paid over to Mortgagee. The Mortgagee may apply all Rents or any part thereof so received hereunder, after the payment of all of its expenses including costs and attorneys' fees, to the Debt in such manner as it elects or at its option the entire amount or any part thereof so received may be released to the Mortgagor.

(b)    All future Leases entered into after the execution of this Mortgage for the whole or any part of the Mortgaged Property shall contain the following provision or a provision substantially the same:

> "Tenant/Lessee hereby agrees not to look to the mortgagee of (i) the fee interest in the premises demised by this Lease or (ii) the lease to which this Lease is subordinate, in such mortgagee's capacity as mortgagee, mortgagee in possession, successor in title to such interest, or otherwise, for accountability for any security deposit required by the landlord hereunder, unless said sums have actually been received by said mortgagee as security for the tenant's performance of this Lease."

Section 1.21. Inconsistency With Related Laws. Nothing contained in this Mortgage shall be construed as depriving the Mortgagee of any right or advantage available under Section 254 or 271, 272 and 291 (f), of the Real Property Law of the State of New York, as the same may be modified or renumbered, from time to time, or any other similar, applicable law of the state in which the Mortgaged Property is located, but all terms, covenants, conditions or obligations herein differing therefrom shall be construed as conferring additional and not

24

substitute rights and advantages, except that the terms, covenants, conditions and obligations of this Mortgage shall supersede the provisions of subdivision 4 of said Section 254.

Section 1.22. Right of Inspection. The Mortgagee and its agents shall have the right to enter and inspect the Mortgaged Property at all reasonable times.

Section 1.23. Late Charges. In the event that any payment cannot be debited on its debit date, a "late charge" of five cents ($.05) for each dollar so overdue may be charged by the Mortgagee for the purpose of defraying the expenses incident to handling such delinquent payment.

Section 1.24. Environmental Matters. (a) For purposes of this Mortgage, the following terms shall have the following meanings:

"Environmental Complaint" - shall mean any judgment, lien, order, complaint, notice, citation, action, proceeding or investigation pending before any Governmental Authority, including, without limitation, any environmental regulatory body, with respect to or threatened against or affecting the Mortgagor or relating to its business, assets, property or facilities or the Mortgaged Property, in connection with any Hazardous Material or any Hazardous Discharge or any Environmental Law.

"Environmental Laws" - shall mean any applicable federal, state or local laws, rules, regulations, resolutions, ordinances, directives or orders (whether now existing or hereafter enacted or promulgated) or any judicial or administrative interpretation of such laws, rules, regulations, resolutions, ordinances, directives or orders or any other applicable determination regarding land, water, air, health, safety or environment including, for example but not limited to, the Federal Statutes and the State Statute.

"Governmental Authority" - shall mean any federal, state, or local government, governing body, agency, court, tribunal, authority, subdivision, bureau or other recognized body having jurisdiction to enact, promulgate, interpret, enforce, review or repeal any Environmental Law.

"Hazardous Discharge" - shall mean any release of a Hazardous Material caused by the seeping, spilling, leaking, pumping, pouring, emitting, using, emptying, discharging, injecting, escaping, leaching, dumping or disposing of any Hazardous Material into the environment, and any liability for the costs of any cleanup or other remedial action.

"Hazardous Materials" - shall mean, without limitation, flammables, explosives, radioactive materials, radon, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls or related or similar materials, petroleum products, explosives, radioactive materials, or any other hazardous or toxic or harmful materials, wastes and substances or any other chemical, material, substance or element which is hereinafter defined, determined, identified, prohibited, limited or regulated by the Environmental Laws, or any other chemical, material, substance or element which is known to be harmful to the health or safety of occupants of property or which is hereinafter defined as a hazardous or toxic substance by any Federal, State, or local law, ordinance, rule or regulation, including, but not limited to the Toxic Substances Control Act (15 U.S.C. 2601 et seq.), the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.), the Clean Air Act (42 U.S.C. 7401 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. 6901 et seq.), the Comprehensive Environmental Response, Compensation and

25

Liability Act of 1980 (42 U.S.C. 9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. 1801 et seq.), and/or the regulations promulgated in relation thereto, all as the same may be amended from time to time (collectively, the "Federal Statutes"); the New York State Environmental Conservation Law Article 27, Title 13 (the "State Statute"), and the regulations promulgated in relation thereto, all as the same may be amended from time to time.

(b)     The Mortgagor covenants, represents and warrants that, except as set forth in the environmental report(s) prepared for the benefit of or otherwise delivered to the Mortgagee:

(i)     No Hazardous Substances are being, or are intended or threatened to be used, received, handled, generated, manufactured, produced, processed, treated, stored, released, placed, spilled, discharged, disposed of or dispersed at, or otherwise caused to become situated at, on, under or about the Mortgaged Property,

(ii)     to the best of the Mortgagor's knowledge, after due inquiry and investigation, the Mortgaged Property has never been used by previous owners, operators or occupants or the Mortgagor to generate, manufacture, refine, transport, treat, store, handle or dispose, transfer, produce, process or in any manner deal with any Hazardous Material,

(iii)     the Mortgagor has not received a summons, citation, directive, letter or other communication, written or oral, from any Government Authority concerning any intentional or unintentional action or omission on the Mortgagor's part which had resulted in the violation of any Environmental Laws, as the same may relate to the Mortgaged Property,

(iv)     no lien has been attached to any revenues or any real or personal property owned by the Mortgagor and located in the state where the Mortgaged Property is located, including, but not limited to the Mortgaged Property, for "Damages" and/or "Cleanup and Removal Costs", as such terms are hereinafter defined in any Environmental Law, or arising from an intentional or unintentional act or omission in violation thereof by the Mortgagor or by any previous owner and/or operator of such real or personal property, including, but not limited to the Mortgaged Property,

(v)     the Mortgagor has duly complied, and shall continue to comply, with the provisions of the Environmental Laws governing it, its business, assets, property, facilities and the Mortgaged Property, and shall keep the Mortgaged Property free and clear of any liens imposed pursuant to such laws,

(vi)     the Mortgagor shall not, and shall not permit any of its officers, shareholders, partners, members, employees, agents, contractors, licensees, tenants, occupants or others to generate, manufacture, refine, transport, treat, store, handle, dispose, transfer, produce, process or in any manner deal with any Hazardous Material on the Mortgaged Property except in accordance with all Environmental Laws applicable thereto,

(vii)     there is not now outstanding any Environmental Complaint issued by any Governmental Authority to the Mortgagor or relating to the Mortgagor's business, assets, property, and facilities or the Mortgaged Property under any Environmental Law, and there is not now existing any condition which, if known by the proper authorities, could result in any Environmental Complaint, and that

26

(viii) the Mortgagor has, and will continue to have, all necessary licenses, certificates and permits under the Environmental Laws relating to the Mortgagor and its facilities, property, assets, and business, and the Mortgaged Property and the foregoing are in compliance with all Environmental Laws.

(c) If the Mortgagor receives any notice of (i) the presence of Hazardous Materials on the Mortgaged Property, (ii) any violation of or noncompliance with any Environmental Law, (iii) the occurrence of a Hazardous Discharge on or about any asset, business, facility or property of the Mortgagor or caused by the Mortgagor, or (iv) any Environmental Complaint affecting the Mortgagor or the Mortgaged Property or the Mortgagor's operations, assets, business, facilities or properties, then the Mortgagor will give written notice of the foregoing to the Mortgagee within ten (10) days of receipt thereof and shall (1) promptly comply with the Environmental Laws and all other laws, regulations, resolutions and ordinances to correct, contain, cleanup, remove, resolve or minimize the impact of such Hazardous Materials, Environmental Discharge or Environmental Complaint and (2) shall at the Mortgagee's option, (i) post a bond from a surety or (ii) cause a lending institution to issue a letter of credit for the benefit of the Mortgagee and any Governmental Authority requiring the same; the surety or the lending institution, and the form, the substance and the amount of the bond or letter of credit to be satisfactory to the Mortgagee and satisfactory to the applicable Governmental Authority, or shall give to the Mortgagee and the applicable Governmental Authority such other security satisfactory in form, substance and amount to both the Mortgagee and the applicable Governmental Authority to assure that the Mortgagor does correct, contain, cleanup, remove, resolve or minimize the impact of such Hazardous Materials, Environmental Discharge or Environmental Complaint.

(d) Notwithstanding the foregoing provisions of Subsection (c) above, the Mortgagor shall have the right (i) to contest (a "Contest") by appropriate administrative, legal or equitable proceedings, diligently prosecuted, in good faith, in its name or in the name of the Mortgagee if required by law, at the sole cost and expense of the Mortgagor, the validity or applicability of any Environmental Laws, or any Environmental Complaint against the Mortgaged Property or the Mortgagor, and (ii) to postpone compliance with the Environmental Laws until the final determination of such Contest without violating the provisions of this Mortgage provided, however:

(i) enforcement proceedings with respect to any and all Environmental Laws are deferred or stayed during the pendency of the Contest,

(ii) the Mortgagee shall not be subject to any civil or criminal or other penalties or liabilities, costs or expenses by reason of any such Contest or postponement in complying with the Environmental Laws,

(iii) the Mortgagor, at Mortgagee's request, shall post a bond, cause the issuance of a letter of credit or provide such other security required under the provisions of Subsection (c) above,

(iv) the lien of this Mortgage shall not be impaired in the sole judgment of the Mortgagee and no default shall exist under this Mortgage,

(v) any Contest shall be instituted promptly after Mortgagor receives notice of the existence of any Environmental Law which imposes an obligation upon the Mortgagor or the Mortgagee or the Mortgagor receives notice of any Environmental Complaint

27

which asserts any obligation or liability affecting the Mortgagor, the Mortgagee or all or any portion of the Mortgaged Property, and such Contest shall at all times be diligently prosecuted until a final disposition is obtained that negates such assertion of obligation or liability,

    (vi) the Mortgagor shall notify the Mortgagee in writing within ten (10) days after commencement of a Contest, and shall give the Mortgagee a monthly report, during the period of a Contest, on the Mortgagor's progress with respect thereto, and shall promptly give the Mortgagee such other information with respect thereto as the Mortgagee shall reasonably request, and

    (vii) the Mortgagee will, at the expense of the Mortgagor, execute and deliver any documents jurisdictionally necessary or proper to prosecute such Contest proceedings. The Mortgagee, at the cost and expense of the Mortgagor, shall have the right (but not the obligation) to join in any Contest.

    (e) Without limitation of the Mortgagee's rights under this Mortgage or applicable law, the Mortgagee shall have the right, but not the obligation, to exercise any of its rights to cure as provided in this Mortgage or to enter onto the Mortgaged Property or to take such other actions as it deems necessary or advisable to correct, contain, cleanup, remove, resolve or minimize the impact of, or otherwise deal with, any such Hazardous Material, Hazardous Discharge or Environmental Complaint upon its receipt of any notice from any person or entity or Governmental Authority, informing the Mortgagee of such Hazardous Material, Hazardous Discharge or Environmental Complaint, which if true, could adversely affect the Mortgagor or any part of the Mortgaged Property or which, in the sole opinion of the Mortgagee, could adversely affect its collateral security under this Mortgage. All costs and expenses incurred and paid by the Mortgagee in the exercise of any such rights shall be paid by the Mortgagor to the Mortgagee upon demand, together with interest from the date that such sum is advanced, payment made or expense incurred, to and including the date of reimbursement, computed at the Default Rate. Any such sum paid by the Mortgagee and the interest thereon shall be a lien on the Mortgaged Property prior to any claim, lien, right, title or interest in, to or on the Mortgaged Property attaching or accruing subsequent to the lien of this Mortgage, and shall be deemed to be secured by this Mortgage and evidenced by the Note.

    (f) The Mortgagee, its officers, employees, agents and contractors, may enter the Mortgaged Property to inspect it and to conduct, complete and take such tests, samples, analyses and other processes (an "Environmental Survey") as the Mortgagee shall require to determine the Mortgagor's compliance with this Subsection and the Environmental Laws. The costs, expenses and fees of the Mortgagee of such entry, inspection, tests, samples, analyses and processes shall be paid and reimbursed by the Mortgagor to the Mortgagee, upon demand, together with interest from the date that such sum is advanced, payment made or expense incurred, to and including the date of reimbursement, computed at the Default Rate. Any such sum paid by the Mortgagee, with interest thereon at the rate provided to be paid on the indebtedness secured by this Mortgage, shall be a lien on the Mortgaged Property prior to any claim, lien, right, title or interest in, to or on the Mortgaged Property attaching or accruing subsequent to the lien of this Mortgage, and shall be deemed to be secured by this Mortgage and evidenced by the Note.

    (g) Upon written request, the Mortgagor shall provide to the Mortgagee the following information pertaining to all operations conducted in or on the Mortgaged Property:

28

(i)    copies of all licenses, certificates and permits under the Environmental Laws;

(ii)    material safety data sheets and maps, diagrams and site plans showing the location of all storage areas and storage tanks for all Hazardous Materials or other chemicals in, used at, manufactured at, brought to or stored at the Mortgaged Property;

(iii)    copies of all materials filed with any Governmental Authority;

(iv)    a description of the operations and processes of the Mortgagor; and

(v)    any other information which the Mortgagee may reasonably require.

(h)    The Mortgagor covenants and agrees, at its sole cost and expense, to indemnify, protect, and save the Mortgagee harmless against and from any and all damages, losses, liabilities, obligations, penalties, claims, litigation, demands, defenses, judgments, suits, proceedings, costs, disbursements or expenses of any kind or of any nature whatsoever (including, without limitation, costs and reasonable attorneys' fees and disbursements, generally, and at trial and appellate level and experts' fees and disbursements) which may at any time be imposed upon, incurred by or asserted or awarded against the Mortgagee and arising from or out of:

(i)    the Mortgagor's failure to perform and comply with this Section,

(ii)    any Hazardous Material, any Hazardous Discharge, any Environmental Complaint, or any Environmental Law applicable to the Mortgagor, its operations, business, assets, property or facilities, or the Mortgaged Property,

(iii)    the imposition of any lien against the Mortgaged Property to the extent of damages caused by, or the extent of the recovery of any costs for the cleanup, release or threatened release of any Hazardous Material, or

(iv)    any action against the Mortgagor under this indemnity or the assertion by the Indemnitor of any defense to its obligations hereunder.

Section 1.25. Trust Funds. In compliance with Section 13 of the New York State Lien Law, the Mortgagor will receive the advances secured by this Mortgage and will hold the right to receive such advances as a trust fund to be applied first for the purpose of paying the cost of improvement (as defined in Section 2 of the Lien Law of the State of New York, whether or not the Mortgaged Property is located in that State), and the Mortgagor will apply the same first to the payment of the cost of improvement before using any part of the total of the same for any other purpose.

Section 1.26. Indemnity. That the Mortgagor hereby indemnifies the Mortgagee and agrees to hold the Mortgagee harmless from and against any and all losses, liabilities, damages, injuries, costs, expenses and claims of any and every kind whatsoever (including reasonable attorneys' fees) paid, incurred or suffered by or asserted against the Mortgagee at any time for, with respect to, or as a direct result of any fraud or intentional misrepresentation by the Mortgagor or any guarantor of the Debt, or the misapplication of any proceeds, or from any and

29

all claims under the Americans with Disability Act or any other law or regulation or from the intentional waste of the Mortgaged Property.

## ARTICLE II

## DEFAULTS AND REMEDIES

**Section 2.1.1. Events of Default-Optional Acceleration.** The Debt shall become due, at the option of the Mortgagee, upon the occurrence of any of the following events, which event shall be an "Event of Default":

(a)     after default in the payment of any installment of principal or interest as provided in the Note;

(b)     after default in the payment when due and payable of any other sum of money required to be paid or expended under this Mortgage, the Note, or any other Loan Document (as hereinafter defined);

(c)     if any warranty, representation or certification made herein or in any financial statement furnished pursuant hereto or in connection with the indebtedness evidenced by the Note and secured by this Mortgage (the "Loan") shall be materially false;

(d)     after default in keeping the Mortgaged Property insured as herein provided;

(e)     after default either in assigning and delivering the policies insuring the Improvements or the Personal Property against loss as hereinafter provided for or in reimbursing the Mortgagee for premiums paid on such insurance, as hereinabove provided for;

(f)     after default after thirty (30) days prior written notice in furnishing a statement of the amount due on this Mortgage and whether any offsets or defenses exist against the Debt, as hereinabove provided for;

(g)     if the Mortgagor does or permits to be done anything that may in any way impair the lien of this Mortgage or impair the value of the Mortgaged Property or any of the Improvements or weaken or diminish the security intended to be given under and by virtue of this Mortgage;

(h)     upon the failure after thirty (30) days prior written notice of the Mortgagor to perform or comply with any other term, covenant, condition or obligation of this Mortgage or of the Note or of any term, covenant, condition or obligation of any other agreement or instrument executed by the Mortgagor or the Guarantor (as defined in the Note) which secures the indebtedness evidenced by the Note (collectively, the "Loan Documents"), or of any other agreement between the Mortgagor and the Mortgagee, in accordance with the terms hereof and thereof;

(i)     a default under, or any attempted withdrawal, cancellation or disclaimer of liability under, any guarantee which guarantees payment of the Debt or any part thereof, or under any agreement giving security for any such guarantee;

30

(j)    the failure of the Mortgagor to perform or observe any term, covenant, condition or obligation of any bond, note, loan agreement, guarantee, or any other instrument or agreement in connection with the borrowing of money or the obtaining of advances or credit, or of any instrument given to secure the same, to which such party and Mortgagee or its affiliates are parties;

(k)    if a default beyond any applicable notice and grace period occurs under any mortgage which is prior, equal or subordinate to the lien of this Mortgage or the mortgagee under any such prior, equal or subordinate mortgage commences a foreclosure action in connection with said mortgage;

(l)    the further mortgage, pledge or encumbrance by the Mortgagor of the Mortgaged Property or any part thereof or any interest therein without the prior written consent of the Mortgagee;

(m)    the further assignment or encumbrance by the Mortgagor of the Rents arising from the Mortgaged Property, or any part thereof, without the prior written consent of the Mortgagee in each instance;

(n)    if the Mortgagor leases all or any part of the Mortgaged Property in violation of Section 1.14 hereof, or effects any changes in any lease in violation of Section 1.14 hereof which is not cured after thirty (30) days prior written notice;

(o)    the occurrence, in the sole judgment of the Mortgagee, of a material adverse change in the identity, control, financial condition or operation of the Mortgagor or the Mortgaged Property;

(p)    if the Mortgaged Property ceases to be leased and managed by the current members of the Mortgagor or such other person or entity as may be approved by the Mortgagee in writing pursuant to a written agreement satisfactory to the Mortgagee in form and substance;

(q)    any default, for thirty (30) days after notice and demand, in the payment of any taxes of any kind and nature, assessments, water and sewer charges, rents and rates, and other governmental or municipal charges, fines or impositions relating to the Mortgaged Property or any part thereof;

(r)    any failure for thirty (30) days after notice and demand to exhibit to the Mortgagee receipted bills for any taxes of any kind and nature, assessments, water and sewer charges, rents and rates, and other governmental or municipal charges, fines or impositions herein referred to;

(s)    if the Mortgagee shall give the written notice specified above in Section 1.4(c) and payment is not made within the timeframe provided therein; or

(t)    the death of the Guarantor (as defined in the Note).

Section 2.1.2.  Events of Default-Automatic Acceleration.  The Debt shall forthwith and automatically become due, upon the occurrence of any of the following events which event shall also be an "Event of Default":

31

if the Mortgagor or the Guarantor shall:

      (i)     call a meeting of or make an assignment for the benefit of creditors,

      (ii)     file a petition in bankruptcy, under Title 11 of the U.S. Code, as amended (the "Bankruptcy Code"), or be adjudicated insolvent or bankrupt, file a petition in bankruptcy, or be adjudicated insolvent or bankrupt,

      (iii)     be the subject of an order for relief under the Bankruptcy Code, or petition or apply to any tribunal for the appointment of a receiver or a trustee for it or a substantial part of its assets,

      (iv)     file any petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future federal or state act or law relating to bankruptcy, insolvency, or other relief for debtors, whether now or hereafter in effect,

      (v)     have filed against it a petition, application or proceeding described above in subdivision (iv) or such a petition, application or proceeding shall have been commenced against it, which remains undismissed or unstayed for a period of thirty (30) days or more,

      (vi)     by any act or omission indicate its consent to, approval of or acquiescence in any petition, application or proceeding described above in subdivision (iv) or in the appointment of a custodian, receiver or any trustee for it or any substantial part of any of its property,

      (vii)     suffer any such custodianship, receivership or trusteeship to continue undischarged for a period of thirty (30) days or more,

      (viii)     conceal, remove or permit to be concealed or removed, any part of its property, with intent to hinder, delay or defraud its creditors or any of them,

      (ix)     make or suffer a transfer of any of its property which may be fraudulent under any bankruptcy, fraudulent conveyance or similar law,

      (x)     make any transfer of its property to or for the benefit of a creditor at a time when other creditors similarly situated have not been paid,

      (xi)     shall suffer or permit, while insolvent, any creditor to obtain a lien upon any of its property through legal proceedings or distraint which is not vacated within thirty (30) days from the date thereof, or

      (xii)     generally not pay its debts as such debts become due.

    **Section 2.2.**  Remedies.  (a) Upon the occurrence of any Event of Default, the Mortgagee may, in addition to any rights or remedies available to it hereunder or at law, take such action as it deems advisable to protect and enforce its rights against the Mortgagor and in and to the Mortgaged Property, including the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as the Mortgagee may determine, in its

32

sole discretion, without impairing or otherwise affecting the other rights and remedies of the Mortgagee:

   (i).  declare the entire unpaid Debt to be immediately due and payable;

   (ii)  enter into or upon the Mortgaged Property, either personally or by its agents, nominees or attorneys, and dispossess the Mortgagor and its agents and servants therefrom, and thereupon the Mortgagee may (A) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Mortgaged Property and conduct the business thereat, (B) complete any construction on the Mortgaged Property in such manner and form as the Mortgagee deems advisable, (C) make alterations, additions, renewals, replacements and improvements to or on the Mortgaged Property, (d) exercise all rights and powers of the Mortgagor with respect to the Mortgaged Property, whether in the name of the Mortgagor or otherwise, including the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all earnings, revenues, rents, issues, profits and other income of the Mortgaged Property and every part thereof, and (E) apply the receipts from the Mortgaged Property to the payment of the Debt, after deducting therefrom all expenses (including attorneys' fees) incurred in connection with the aforesaid operations and all amounts necessary to pay the taxes, assessments, insurance and other charges in connection with the Mortgaged Property, as well as compensation for the services of the Mortgagee, its agents and employees;

   (iii)  institute proceedings for the complete foreclosure of this Mortgage, in which case the Mortgaged Property may be sold for cash or credit in one or more parcels, and in such order as the Mortgagee shall determine;

   (iv)  with or without entry and, to the extent permitted, and pursuant to the procedures provided by, applicable law, institute proceedings for the partial foreclosure of this Mortgage for the portion of the Debt then due and payable, subject to the lien of this Mortgage continuing unimpaired and without loss of priority so as to secure the balance of the Debt not then due;

   (v)  sell the Mortgaged Property or any part thereof and all estate, claim, demand, right, title and interest of the Mortgagor therein and rights of redemption thereof, pursuant to power of sale or otherwise, at one or more sales, in whole or in parcels, at such time and place, upon such terms and after such notice thereof as may be required or permitted by law, and in the event of a sale, by foreclosure or otherwise, of less than all of the Mortgaged Property, this Mortgage shall continue as a lien on the remaining portion of the Mortgaged Property;

   (vi)  institute an action, suit or proceeding in equity for the specific performance of any covenants, conditions or agreements contained herein or in the Note or in any other Loan Document;

   (vii)  recover judgment on the Note before, during, after or in lieu of any proceedings for the enforcement of this Mortgage;

   (viii)  apply for the appointment of a custodian, trustee, receiver, liquidator or conservator of the Mortgaged Property, without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of the Mortgagor, or of any person, party or entity liable for the payment of the Debt;

33

(ix)     pursue such other remedies as the Mortgagee may have under one or more of the other Loan Documents and/or any other collateral given as security for the Loan;

(x)     pursue such remedies as the Mortgagee may have under applicable law; and

(xi)     foreclose this Mortgage by power of sale or any other non-judicial means permitted by the laws of the state in which the Mortgaged Property is located.

(b)     The purchase money proceeds or avails of any sale made under or by virtue of this Section 2.2, together with any other sums which then may be held by the Mortgagee under this Mortgage, whether under the provisions of this Section 2.2 or otherwise, shall be applied as follows:

First:  To the payment of the costs and expenses of any such sale, including, without limitation, compensation to the Mortgagee, its agents and counsel, and of any judicial proceedings, including, without limitation, the costs and legal expenses of the Mortgagee in foreclosing or otherwise enforcing this Mortgage, wherein the same may be made, and of all expenses, liabilities and advances made or incurred by the Mortgagee under this Mortgage, together with interest at the Default Rate, and all taxes or assessments, except any taxes, assessments or other charges subject to which the Mortgaged Property shall have been sold.

Second:  To the payment of the whole amount then due, owing or unpaid upon the Note for principal and interest with interest on the unpaid principal at the Default Rate from and after the happening of any Event of Default described above in Section 2.1 until the same is paid.

Third:  To the payment of any other sums required to be paid by the Mortgagor pursuant to any provision of this Mortgage, the Note and all other Loan Documents.

Fourth:To the payment of the surplus, if any, to whosoever may be lawfully entitled to receive the same.

The Mortgagee and any receiver or custodian of the Mortgaged Property or any part thereof shall be liable to account for only those rents, issues and profits actually received by it.

(c)     The Mortgagee may adjourn from time to time any sale by it to be made under or by virtue of this Mortgage by announcement at the time and place appointed for such sale or for such adjourned sale or sales; and, except as otherwise provided by any applicable provision of law, the Mortgagee, without further notice or publication, may make such sale at the time and place to which the same shall be so adjourned.

(d)     Upon the completion of any sale or sales made by the Mortgagee under or by virtue of this Section 2.2, the Mortgagee, or an officer of any court empowered to do so, shall execute and deliver to the accepted purchaser or purchasers a good and sufficient instrument, or good and sufficient instruments, granting, conveying, assigning and transferring all estate, right, title and interest in and to the property and rights sold.  The Mortgagee is hereby irrevocably appointed the true and lawful attorney-in-fact of the Mortgagor (coupled with an interest), in its name and stead, to make all necessary conveyances, assignments, transfers and deliveries of the Mortgaged Property and rights so sold and for that purpose the Mortgagee may execute all

34

necessary instruments of conveyance, assignment, transfer and delivery, and may substitute one or more persons or entities with like power, the Mortgagor hereby ratifying and confirming all that its said attorney or such substitute or substitutes shall lawfully do by virtue hereof. Nevertheless, the Mortgagor, if so requested by the Mortgagee, shall ratify and confirm any such sale or sales by executing and delivering to the Mortgagee or to such purchaser or purchasers all such instruments as may be advisable, in the judgment of the Mortgagee, for such purpose, and as may be designated in such request. Any such sale or sales made under or by virtue of this Section 2.2, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, shall operate to divest all the estate, right, title, interest, claim and demand whatsoever, whether at law or in equity, of the Mortgagor in and to the properties and rights so sold, and shall be a perpetual bar both at law and in equity against the Mortgagor and against any and all persons or entities claiming or who may claim the same, or any part thereof, either from, through or under the Mortgagor.

(e)    Upon any sale made under or by virtue of this Section 2.2 (whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale), the Mortgagee may bid for and acquire the Mortgaged Property or any part thereof and in lieu of paying cash therefor may take settlement for the purchase price by crediting upon the Debt of the Mortgagor secured by this Mortgage the net sale price after deducting therefrom the expenses of the sale and the costs of the action and any other sums which the Mortgagee is authorized to deduct under this Mortgage.

(f)    The obligation of this Mortgage and of the Note shall continue until the Debt is paid in full notwithstanding any action or actions or partial foreclosure which may be brought to recover any amount or amounts for installments of principal, interest, taxes, assessments, water and sewer charges, rents and rates or insurance or other sums or charges due and payable under the provisions of this Mortgage.

(g)    No recovery of any judgment by the Mortgagee and no levy of an execution under any judgment upon the Mortgaged Property or upon any other property of the Mortgagor shall affect in any manner or to any extent, the lien of this Mortgage upon the Mortgaged Property or any part thereof, or any liens, rights, power or remedies of the Mortgagee hereunder, but such liens, rights, powers and remedies of the Mortgagee shall continue unimpaired as before, and notwithstanding any statutory rate of interest applicable with respect to judgments, after the entering or execution of any judgment, the Debt shall bear interest at the rate or rates payable under the Note and this Mortgage until the Debt shall have been paid in full.

(h)    In the event of a foreclosure of this Mortgage or the succession by the Mortgagee to the interests of the Mortgagor hereunder, the purchaser of the Mortgaged Property or such successor shall succeed to all rights of the Mortgagor, including any right to proceeds of insurance and to unearned premiums, and in and to all policies or certificates of insurance assigned and delivered to the Mortgagee pursuant to this Mortgage.

(i)    During such time that the Mortgagor shall be in default under this Mortgage, or under the Note, the Mortgagee, in the event that the Mortgagor shall not file a protest against any proposed assessed valuation of the Mortgaged Property at least fifteen (15) days prior to the last date on which such protest may be legally filed, or having filed such protest and the same having been denied, shall not have commenced a proceeding for the reduction of said assessed valuation at least fifteen (15) days prior to the last date of which such proceedings may be legally commenced, the Mortgagee may, but shall have no obligation to, file such protest

35

or commence and prosecute such proceeding, in its own name or in the name of the Mortgagor, and the Mortgagor agrees to cooperate fully, in good faith, with the Mortgagee in the conduct of any such proceeding. All expenses of any such filing by the Mortgagee or its commencement of any such proceeding, including, but limited to, reasonable counsel fees, shall be borne by the Mortgagor, and if paid by the Mortgagee shall be reimbursed by the Mortgagor to the Mortgagee, its successors or assigns, upon demand, together with interest from the date that such sum is advanced, payment made or expense incurred, to and including the date of reimbursement, computed at the Default Rate. All expenses incurred by the Mortgagee, as described above in this Subsection, and the interest thereon, shall be a lien on the Mortgaged Property prior to any claim, lien, title or interest in, to or on or claim upon the Mortgaged Property attaching or accruing subsequent to the lien of this Mortgage and shall be deemed to be secured by this Mortgage and evidenced by the Note.

(j)　　THE MORTGAGOR HEREBY WAIVES THE RIGHT TO TRIAL BY JURY, THE RIGHT TO CLAIM ANY OFFSET AND THE RIGHT TO ASSERT A COUNTERCLAIM IN ANY ACTION OR PROCEEDING BROUGHT BY THE MORTGAGEE TO ENFORCE ANY OF ITS RIGHTS UNDER THE NOTE OR UNDER THIS MORTGAGE.

(k)　　Any assignee of this Mortgage and the Note shall take the same free and clear of all offsets, counterclaims and defenses of any nature whatsoever which the Mortgagor may have against any assignor of this Mortgage and the Note and no such offset, counterclaim or defense shall be interposed or asserted by the Mortgagor in any action or proceeding brought by any such assignee upon this Mortgage and/or the Note and any such right to interpose or assert any such offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by the Mortgagor.

(l)　　The Mortgagor shall not be relieved of the Mortgagor's obligation to pay the Debt at the time and in the manner provided for in the Note and this Mortgage by reason of (i) failure of the Mortgagee to comply with any request of the Mortgagor or any guarantor of the payment of the Note and/or of this Mortgage to take any action to foreclose this Mortgage or otherwise enforce any of the provisions hereof or of the Note or of any other mortgage, instrument or document evidencing, securing or guaranteeing payment of the Debt or any portion thereof, (ii) the release, regardless of consideration, of the whole or any part of the Mortgaged Property or any other security for the Debt or the release of any individual or entity guaranteeing the payment of the Note and/or of this Mortgage, or (iii) the extension or modification of this Mortgage or any other mortgage, instrument or document evidencing, securing or guaranteeing payment of the Note and/or of this Mortgage or any portion thereof, without first having obtained the consent of the Mortgagor, and in the last event, the Mortgagor shall continue to be obligated to pay the Debt at the time and in the manner provided in the Note and this Mortgage, as so extended or modified, unless expressly released and discharged by the Mortgagee. Regardless of consideration, and without the necessity for any notice to or consent by the holder of any subordinate lien, encumbrance, right, title or interest in or to the Mortgaged Property, the Mortgagee may release any person or entity at any time liable for the payment of the Debt or any portion thereof or any individual or entity guaranteeing the payment of the Note and/or of this Mortgage or any part of the security held for the Debt or with respect to any guarantee, and may extend the time of payment or otherwise modify any of the terms, covenants, conditions or obligations of the Note and/or this Mortgage, including, without limitation, a modification of the interest rate payable on the principal balance of the Note, without in any manner impairing or affecting this Mortgage or the lien thereof or the priority of this Mortgage, as so extended and

36

modified, as security for the Debt over any such subordinate lien, encumbrance, right, title and interest. The Mortgagee may resort for the payment of the Debt to any other security or guarantee held by the Mortgagee in such order and manner as the Mortgagee, in its discretion, may elect. The Mortgagee shall not be limited exclusively to the rights and remedies herein stated but shall be entitled to every additional right and remedy now or hereafter afforded by law or equity.

(m)    The Mortgagee shall have the right from time to time to take action to recover any sum or sums which constitute a part of the Debt as the same become due, without regard to whether or not the balance of the Debt shall be due, and without prejudice to the right to the Mortgagee thereafter to bring an action of foreclosure, or any other action, for a default or defaults by the Mortgagor existing at the time such earlier action was commenced.

(n)    The Mortgagee shall have the right to receive and accept partial payment of any sum or sums which constitute a part of the Debt or the interest accrued thereon and such receipt and acceptance by the Mortgagee shall not be deemed a waiver or modification of any default or defaults by the Mortgagor existing at such time.

(o)    All remedies provided in this Mortgage are distinct and cumulative to any other right or remedy under this Mortgage, the Note, any guarantee of the payment of the Note and/or of this Mortgage or any other agreement between, among others, if any, the Mortgagor and the Mortgagee executed simultaneously or in connection herewith, or afforded by law or equity, and may be exercised concurrently, independently or successively. Wherever in this Mortgage the prior consent of the Mortgagee is required, the consent of the Mortgagee given as to one such transaction shall not be deemed to be a waiver of the right to require such consent to future or successive transactions. Any such consents shall be in writing.

(p)    Any forbearance by the Mortgagee in exercising any right or remedy hereunder, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any such right or remedy. The procurement of insurance or the payment of taxes or other liens or charges by the Mortgagee or other corrective or security protecting measures by the Mortgagee shall not be a waiver of the Mortgagee's right to accelerate the maturity of the Debt.

(q)    In any action or proceeding to foreclose this Mortgage, or to recover or collect the Debt, the provisions of law respecting the recovery of costs, disbursements and allowances shall also be applicable.

Section 2.3.   Interest After Default.   If any payment due hereunder or under the Note is not paid when due, whether on any stated due date, any accelerated due date or any other date or at any other time specified under any of the terms, covenants, conditions or obligations hereof or thereof, then and in such event, the Mortgagor shall pay interest on the entire outstanding and unpaid principal balance of the Debt, from and after the date on which such amount first became due, at the Default Rate and such interest shall be due and payable, on demand, at such rate until the entire amount due is paid to the Mortgagee, whether or not any action shall have been taken or proceeding commenced to recover the same or to foreclose this Mortgage. All accrued but unpaid interest shall be secured by this Mortgage as part of the Debt together with interest from the date that such sum is advanced, payment made or expense incurred, to and including the date of reimbursement, computed at the Default Rate. Nothing in this Section 2.3 or in any other provision of this Mortgage shall constitute an extension of the time of payment of the Debt or

37

shall increase the maximum principal amount which may under any contingency be secured by this Mortgage.

Section 2.4. Possession of the Mortgaged Property. Upon the occurrence of any Event of Default hereunder, it is agreed that the Mortgagor, if it is then the occupant of the Mortgaged Property or any part thereof, shall immediately surrender possession of the space so occupied to the Mortgagee, custodian, trustee, receiver, liquidator or conservator of the Mortgaged Property, as may be the case, and if the Mortgagor is permitted to remain in possession, the possession shall be as a month-to-month tenant of the Mortgagee, and, on demand, the Mortgagor shall pay to the Mortgagee monthly, in advance, a reasonable rental for the space so occupied and in default thereof the Mortgagor may be dispossessed by the usual summary proceedings. The covenants herein contained may be enforced by a receiver of the Mortgaged Property or any part thereof. Nothing in this Section 2.4 shall be deemed to be a waiver of the provisions of this Mortgage prohibiting the sale or other disposition of the Mortgaged Property without the Mortgagee's prior written consent.

## ARTICLE III

## MISCELLANEOUS

Section 3.1. Notices. All notices or other communications required or otherwise given pursuant to this Mortgage shall be in writing and shall be personally delivered, delivered by overnight courier or mailed by registered or certified mail, postage prepaid, with return receipt requested, addressed as follows:

If to the Mortgagor:

    Eight-115 Associates, LLC
    c/o Reifer Management
    245 Seventh Avenue, #9D
    New York, New York 10026
    Attention: Daniel Reifer

If to the Mortgagee:

    Signature Bank
    68 South Service Road
    Melville, New York 11747
    Attention: Kenneth A. Stagnari, Vice President

Any party may change the person or address to whom or which notices are to be given hereunder, by notice duly given hereunder; provided, however, that any such notice shall be deemed to have been given hereunder only when actually received by the party to which it is addressed. Any notice or other communication given hereunder shall be deemed to have been given or delivered, if personally delivered, upon delivery, if sent by overnight courier, on the first (1st) business day of the Mortgagee after being sent, and if sent by mail, on the third (3rd) business day of the Mortgagee after mailing. Each party shall be entitled to rely on all communications which purport to be given on behalf of any other party hereto and purport to be signed by an authorized signatory of such party.

38

**Section 3.2. Consent to Jurisdiction; Waivers.** (a) The Mortgagor hereby consents to the jurisdiction of the courts of the State of New York and the state where the Mortgaged Property is located if the Mortgaged Property is not located in the State of New York in any actions, suits or proceedings arising out of or in connection with the Note or this Mortgage. In addition, the Mortgagor irrevocably and unconditionally waives any objection which the Mortgagor may now or hereafter have to the laying of venue of any of the aforesaid actions, suits, or proceedings arising out of or in connection with the Note or this Mortgage brought in any of the aforesaid courts; and hereby further irrevocably and unconditionally waives the right to plead or claim that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum; and

(b)     The Mortgagor waives the requirements of personal service in connection with any actions, suits or proceedings arising out of or in connection with the Note or this Mortgage, and consents that all service of process may be made by certified mail, return receipt requested, addressed to the Mortgagor at the address of the Mortgagor set forth above in Section 3.1 as such address may be changed as therein set forth.

**Section 3.3. Governing Law.** Except to the extent that the law of the state where the Mortgaged Property is located must be applied because this Mortgage constitutes a lien on premises located in that state, this Mortgage shall be construed in accordance with the laws of the State of New York.

**Section 3.4. Binding Obligations.** The terms, covenants, provisions and conditions herein contained shall bind and inure to the benefit of the heirs, distributees, executors, administrators, successors and assigns of the parties hereto but the foregoing provisions of this Section shall not constitute a waiver of the provisions of Sections 1.13 and 1.14 above.

**Section 3.5. Further Assurances.** The Mortgagor will, at the request of the Mortgagee and at the cost and expense of the Mortgagor (a) promptly correct any defect, error or omission which may be discovered in the contents of this Mortgage, or in the execution, acknowledgment or recordation hereof, or (b) promptly do, execute, acknowledge and deliver any and all such further acts, deeds, conveyances, mortgages, deeds of trust, amendments, supplements, assignments, estoppel certificates, financing statements and continuations thereof, notices of assignment, transfers, certificates, assurances and other instruments as the Mortgagee may reasonably require from time to time in order to (i) effectuate the purposes of this Mortgage, (ii) subject to the lien and security interest hereby created any of the Mortgagor's properties, rights or interests covered or now or hereafter intended to be covered hereby, (iii) perfect and maintain such lien and security interest, or (iv) convey, grant, assign, transfer and confirm unto the Mortgagee the rights granted or now or hereafter intended to be granted to the Mortgagee hereunder or under any other instrument executed in connection with this Mortgage or which the Mortgagor may be or become bound to convey, mortgage or assign to the Mortgagee in order to carry out the intention or facilitate the performance of the provisions of this Mortgage. The Mortgagor hereby appoints the Mortgagee as its attorney-in-fact to execute, acknowledge and deliver for and in the name of the Mortgagor any and all of the instruments mentioned in this Section 3.5 and this power, being coupled with an interest, shall be irrevocable as long as any part of the Debt remains unpaid.

**Section 3.6. Captions.** The title of this document and the captions used herein are inserted only as a matter of convenience and for reference and shall in no way define, limit or

describe the scope or intent of this Mortgage or any of the provisions hereof.

Section 3.7. Severability. If any term, covenant, condition or obligation of this Mortgage shall be held to be invalid, illegal or unenforceable in any respect, this Mortgage shall be construed without such term, covenant, condition or obligation.

Section 3.8. Set-Off. The Mortgagor, to further secure the Debt, hereby (a) pledges and grants to the Mortgagee a security interest in and to and a lien on, any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by the Mortgagee or any affiliate thereof to or for the credit or account of the Mortgagor (collectively, "Deposits"), and (b) irrevocably authorizes and directs the Mortgagee or any affiliate thereof at any time and from time to time upon the occurrence of an Event of Default under this Mortgage, or a default under the Note or any other Loan Document, without notice to the Mortgagor (any such notice being expressly waived by the Mortgagor) and to the fullest extent permitted by law, to set off and apply any such Deposits against any and all obligations of the Mortgagor now or hereafter existing under the Loan Documents, or to hold such Deposits for future application against obligations thereafter arising under any of the Loan Documents irrespective of whether or not the Mortgagee shall have made any demand under any of the Loan Documents and although such obligations may be contingent or unmatured. From and after the date of the occurrence of any default under any of the Loan Documents, the Mortgagee shall have dominion and control over such Deposits and shall have the sole ability to make withdrawals with respect to such Deposits. The Mortgagee agrees promptly to notify the Mortgagor after any such application made by the Mortgagee; provided, however, that the failure to give such notice shall not affect the validity of such application. The rights of the Mortgagee under this Section are in addition to other rights and remedies (including, without limitation, other rights of set-off) which the Mortgagee may have hereunder or under applicable laws.

Section 3.9. General Conditions. (a) No provision of this Mortgage may be waived, changed, amended, modified or discharged orally and no executory agreement shall be effective to modify or discharge it in whole or in part, unless it is in writing and signed by the party against whom enforcement of the waiver, change, amendment, modification or discharge is sought.

(b)    The Mortgagee may take or release other security for the payment of the Loan, may release any party primarily or secondarily liable therefor and may apply any other security held by it to the reduction or satisfaction of the Loan without prejudice to any of its rights under this Mortgage.

(c)    No remedy herein conferred upon or reserved to the Mortgagee is intended to be exclusive of any other remedy or remedies, and each and every such remedy shall be cumulative, and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute. No delay or omission of the Mortgagee in exercising any right or power accruing upon any Event of Default shall impair any such right or power, or shall be construed to be a waiver of any such Event of Default, or any acquiescence therein. Nothing in this Mortgage or in the Note shall affect the obligation of the Mortgagor to pay the Debt in the manner and at the time and place therein respectively expressed. All rights and remedies of the Mortgagee shall be cumulative and may be exercised singly or concurrently. Notwithstanding anything herein contained to the contrary, the Mortgagor: (i) will not (A) at any time insist upon, or plead, or in any manner whatever claim or take any benefit or advantage of any stay or extension or moratorium law, any exemption from execution or sale of the

40

Mortgaged Property or any part thereof, wherever enacted, now or at any time hereafter in force, which may affect any of the terms, covenants, conditions or obligations of this Mortgage, or (B) claim, take or insist upon any benefit or advantage of any law now or hereafter in force providing for the valuation or appraisal of the Mortgaged Property, or any part thereof, prior to any sale or sales thereof which may be made pursuant to any provision hereof, or pursuant to the decree, judgment or order of any court of competent jurisdiction; (ii) waives all benefit or advantage of any such law or laws; (iii) covenants not to hinder, delay or impede the execution of any power herein granted or delegated to the Mortgagee, but to suffer and permit the execution of every power as though no such law or laws had been made or enacted; and (iv) waives all right to have the Mortgaged Property, or any other property of the Mortgagor to which the Mortgagee has, or may in the future have, a claim, marshaled upon any foreclosure hereof.

(d)   No waiver by the Mortgagee or modification of the terms hereof shall be effective unless it is in writing and then only in the specific instance and for the specific purpose for which given and, notwithstanding anything to the contrary herein, all such waivers and modifications may be given or withheld in the sole judgment of the Mortgagee. Without limiting the generality of the foregoing, any payment made by the Mortgagee for insurance premiums, taxes, assessments, water rates, sewer rentals, levies, fees or any other charges affecting the Mortgaged Property, shall not constitute a waiver of the Mortgagor's default in making such payments and shall not obligate the Mortgagee to make any further payments. The Mortgagor hereby irrevocably waives any right to claim that any provision of this Mortgage, including the provisions set forth in this Subsection, have been waived orally or by the acts or omissions of the Mortgagee.

(e)   THE MORTGAGOR ACKNOWLEDGES THAT IT HAS RECEIVED A TRUE COPY OF THIS MORTGAGE.

(f)   If the Mortgagor shall request the Mortgagee's consent or approval pursuant to any of the provisions of this Mortgage or otherwise, and the Mortgagee shall fail or refuse to give, or shall delay in giving, such consent or approval, the Mortgagor shall in no event make, or be entitled to make, any claim for damages (nor shall the Mortgagor assert, or be entitled to assert, any such claim by way of defense, set-off, or counterclaim) based upon any claim or assertion by the Mortgagor that the Mortgagee unreasonably withheld or delayed its consent or approval, and the Mortgagor hereby waives any and all rights that it may have, from whatever source derived, to make or assert any such claim. The Mortgagor's sole remedy for any such failure, refusal, or delay shall be an action for a declaratory judgment, specific performance, or injunction, and such remedies shall be available only in those instances where the Mortgagee has expressly agreed in writing not to unreasonably withhold or delay its consent or approval or where, as a matter of law, the Mortgagee may not unreasonably withhold or delay the same.

(g)   This Mortgage shall (i) be binding upon the Mortgagor and its successors and assigns, and (ii) inure, together with all rights and remedies of the Mortgagee hereunder, to the benefit of the Mortgagee and its successors, transferees and assigns. Without limiting the generality of clause (ii) of the immediately preceding sentence, the Mortgagee may assign or otherwise transfer all or any portion of its rights and obligations under any Loan Document, to any other person or entity, and such other person or entity shall thereupon become vested with all of the rights and obligations in respect thereof granted to the Mortgagee herein or otherwise. None of the rights or obligations of the Mortgagor hereunder may be assigned or otherwise transferred without the prior written consent of the Mortgagee.

41

(h)     Without limiting the generality of Subsection (g) above, the Mortgagor hereby acknowledges that the Mortgagee may sell, grant or assign participation interest(s) in the Loan and in the Mortgagee's rights and obligations in respect of the Loan Documents, including this Mortgage, to one or more lending institutions satisfactory to the Mortgagee, on terms satisfactory to the Mortgagee.   In the event that the Mortgagee shall sell, grant or assign participation interest(s) in the Loan and in the Mortgagee's rights and obligations in respect of the Loan Documents, (i) the Mortgagee may, in its sole discretion, disclose financial and other information to prospective participant(s) with respect to the Mortgagor, (ii) the Mortgagor shall cooperate with the Mortgagee in connection with any such participation and shall execute any and all documents which may be required or desirable, in the Mortgagee's or such participants' judgment, to effectuate any such participation(s), and (iii) each representation and agreement made by the Mortgagor in this Mortgage or in any of the other Loan Documents shall run to, and each reference to the Mortgagee shall be deemed to refer to, the Mortgagee and all of its participants(s).

(i)     If the Mortgagor consists of more than one person or entity, the obligations and liabilities of each such person or entity hereunder shall be joint and several. The relative words herein of single or plural number, or masculine or feminine or neuter gender shall be read as if written in the single or plural, or in the male, neuter or female gender, as the context and as the case may be.

(j)     Any check, draft, money order or other instrument given in payment of all or any portion of the Note or pursuant to this Mortgage may be accepted by the Mortgagee and handled in collection in the customary manner, but the same shall not constitute payment hereunder or diminish any rights of the Mortgagee, except to the extent that actual cash proceeds of such instrument are unconditionally received by the Mortgagee and applied as the case may be to the Debt in the manner provided in the Note or to the sum due under this Mortgage.

(k)     The Mortgaged Property is not improved nor is it to be improved by one or more structures containing, in the aggregate, six or fewer residential units, each unit with separate cooking facilities.

(l)     If the Mortgagor shall well and truly pay to the Mortgagee the Debt at the time and in the manner provided in the Note and this Mortgage and shall well and truly abide by and comply with each and every term, covenant, condition and obligation set forth in this Mortgage and in the Note, then these presents and the estate hereby granted shall cease, terminate and be void.

(m)     This Mortgage may be executed in any number of duplicate originals and each such duplicate original shall be deemed to constitute but one and the same instrument.

Section 3.10.   Assignment.   Upon repayment to the Mortgagee of all amounts outstanding under the Note and this Mortgage, at the written request and direction of the Mortgagor, the Mortgagee shall execute and deliver an assignment of this Mortgage (in recordable form) and the Note provided the Mortgagor shall be responsible for the payment of the Mortgagee's standard assignment fee (which is currently $750) and the reasonable fees and expenses of the Mortgagee's counsel.   In addition, the Mortgagee shall have no liability in the event it is unable to locate and deliver this Mortgage and the Note (or any underlying notes and/or mortgages) provided the Mortgagee shall execute and deliver the Mortgagee's standard lost note affidavit in form and substance reasonably satisfactory to the Mortgagee.

42